[861 NE2d 50, 828 NYS2d 235]

Campaign for Fiscal Equity, Inc., et al., Appellants-Respondents, v State of New York et al., Respondents-Appellants.

Argued October 10, 2006; decided November 20, 2006

**POINTS OF COUNSEL**

*Simpson Thacher & Bartlett LLP,* New York City (*Joseph F. Wayland, Daniel H. Tabak, Jason S. Stone, Chad M. Leicht* and *Lisa H. Rubin* of counsel), and *Michael A. Rebell Associates* (*Michael A. Rebell* and *Molly A. Hunter* of counsel) for appellants-respondents. I. This Court must issue a clear, enforceable compliance directive. II. The Supreme Court's accountability provisions should be reinstated and linked to prudent planning for a four-year phase-in of the funding increases. III. This Court

should issue a final compliance order and retain jurisdiction to consider further enforcement action, if necessary. (*McCain v Dinkins,* 84 NY2d 216.)

*Eliot Spitzer, Attorney General,* Albany (*Denise A. Hartman, Caitlin J. Halligan* and *Daniel Smirlock* of counsel), for respondents-appellants. I. Defendants' method of calculating the cost of a sound basic education, properly approved by the Appellate Division, yields the conclusion that $1.93 billion, not $4.7 billion, is the amount of additional spending needed to provide a constitutionally sound education in New York City. (*Board of Educ., Levittown Union Free School Dist. v Nyquist,* 57 NY2d 27; *Paynter v State of New York,* 100 NY2d 434.) II. The Appellate Division erred in holding that New York City is entitled to $9.179 billion for capital projects. III. The Appellate Division should not have vacated the portion of Supreme Court's order requiring New York City to make critical management and accountability reforms that ensure that funds are used effectively. IV. The Court lacks authority to issue an order requiring the State of New York to provide at least an additional $4.7 billion annually for operating expenditures and $9.179 billion for capital improvements in New York City's schools. (*City of New York v State of New York,* 86 NY2d 286; *Pataki v New York State Assembly,* 4 NY3d 75; *Jones v Beame,* 45 NY2d 402; *Anderson v Regan,* 53 NY2d 356; *Marbury v Madison,* 1 Cranch [5 US] 137; *Cohen v State of New York,* 94 NY2d 1; *Schieffelin v Komfort,* 212 NY 520; *Klostermann v Cuomo,* 61 NY2d 525; *People ex rel. Broderick v Morton,* 156 NY 136; *Merritt Hill Vineyards v Windy Hgts. Vineyard,* 61 NY2d 106.) V. The Appellate Division properly rejected Supreme Court's call for follow-up costing-out studies conducted periodically for the indefinite future. (*Board of Educ., Levittown Union Free School Dist. v Nyquist,* 57 NY2d 27.)

*Jay Worona,* Latham, and *Pilar Sokol* for New York State School Boards Association, Inc., amicus curiae. I. The separation of powers doctrine does not preclude this Court from issuing a clear enforceable compliance directive. (*Board of Educ., Levittown Union Free School Dist. v Nyquist,* 57 NY2d 27.) II. In enforcing compliance with its prior directive that the State of New York reform its school funding system, this Court should provide guidance on the constitutional parameters applicable to such reform.

*Stroock & Stroock & Lavan LLP,* New York City (*Charles G.*

*Moerdler, Alan M. Klinger, Adam S. Ross* and *Beth A. Norton* of counsel), and *Carol L. Gerstl* for United Federation of Teachers, amicus curiae. I. Increases in funding, when directed to specific, proven programs, have begun to improve the quality of education provided in New York City public schools, but further increases in funding, far beyond that which the State of New York proposes, are required to provide a sound basic education to all children. II. In order to have true accountability, additional Campaign for Fiscal Equity funds must be spent in a manner consistent with sound educational planning and on programs that have proven successful.

*Paul, Weiss, Rifkind, Wharton & Garrison LLP,* New York City (*Sidney S. Rosdeitcher, Carmen K. Cheung* and *Evan Norris* of counsel), and *Jonathan Rosenberg* for Association of the Bar of the City of New York, amicus curiae. The experience in other states in which the political branches have failed to act demonstrates why it is imperative that this Court now issue a clear, precise, and enforceable remedial order. (*Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801.)

*Davis Polk & Wardwell,* New York City (*Sharon Katz, Monica Lamb, Christina C. Lindberg, David B. Toscano* and *Margaret A. Vining* of counsel), for Alliance for Quality Education and others, amici curiae. I. A "generation" of New York City schoolchildren has been denied the constitutionally mandated opportunity for a sound basic education in the 13 years since this action was initiated. II. The Appellate Division erred in vacating the accountability provisions in the Supreme Court's order.

*Elizabeth R. Fine,* New York City, *Alvin Bragg, James Caras, Laura Popa* and *Scheherazade Salimi* for Council of the City of New York, amicus curiae. I. The City of New York needs additional state funds to provide a sound, basic education to its schoolchildren. II. The Department of Education (DOE) should submit accountability reports to the Council of the City of New York, which will exercise its New York City Charter-mandated duties to hold DOE accountable.

*Community Service Society,* New York City (*Juan Cartagena* and *Craig Acorn* of counsel), for Adriano Espaillat and others, amici curiae. I. This Court must issue a specific and enforceable order because the political branches' failure to meet the constitutional standard results in grave harm to impoverished and racial minority New York City schoolchildren. (*Brown v Board of Education,* 347 US 483; *Alexander v Sandoval,* 532 US

275.) II. This Court's issuance of a specific and enforceable order will not offend the separation of powers doctrine. (*Bourquin v Cuomo,* 85 NY2d 781; *Matter of Richardson,* 247 NY 401; *Marbury v Madison,* 1 Cranch [5 US] 137; *Boryszewski v Brydges,* 37 NY2d 361.)

*Suzanne Novak,* New York City, for Brennan Center for Justice at New York University School of Law, amicus curiae. New York's dysfunctional legislative process provides unique justification for this Court to issue an enforceable compliance directive. (*Baker v Carr,* 369 US 186; *Reynolds v Sims,* 377 US 533; *Missouri v Jenkins,* 495 US 33; *United States v Carolene Products Co.,* 304 US 144; *Conservation Force, Inc. v Manning,* 301 F3d 985; *Graham v Richardson,* 403 US 365; *Anderson v Celebrezze,* 460 US 780; *San Antonio Independent School Dist. v Rodriguez,* 411 US 1.)

*Michael A. Cardozo, Corporation Counsel,* New York City (*Leonard Koerner, Alan H. Kleinman, Brad M. Snyder* and *Elizabeth S. Natrella* of counsel), for City of New York, amicus curiae. I. The Court should affirm the findings regarding the amount of additional funding that the State of New York must provide the City of New York's schools and should order the State to enact the school aid formula reform and provide the additional funds it now concedes are required. (*Board of Educ., Levittown Union Free School Dist. v Nyquist,* 57 NY2d 27; *Wise v Lipscomb,* 437 US 535; *Connor v Finch,* 431 US 407.) II. The State of New York should be prohibited from singling out the City of New York to provide the funds needed to remedy the State's constitutional violation. (*New York County Lawyers' Assn. v Pataki,* 188 Misc 2d 776, 294 AD2d 69; *Doe v Dinkins,* 192 AD2d 270.) III. A rigorous system of accountability already governs the City of New York's schools and no further accountability system should be ordered by this Court. IV. The State of New York's actions regarding capital funds bring a successful resolution to this aspect of the Campaign for Fiscal Equity mandate.

**OPINION OF THE COURT**

PIGOTT, J.

In this third appeal by plaintiffs Campaign for Fiscal Equity, Inc. (CFE), et al., we address the cost of providing children in New York City's public schools with a sound basic education. The State estimated this cost to include a minimum of $1.93 billion, in 2004 dollars, in additional annual operating funds.

We conclude that this estimate was a reasonable one and that the courts should defer to this estimate, appropriately updated.

## I.

More than a decade ago, we held that the Education Article of the New York State Constitution requires the State "to offer all children the opportunity of a sound basic education" (*Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 316 [1995] [*CFE I*]). Plaintiffs had sought a declaratory judgment against the State, claiming that students in New York City public schools were not receiving a basic education and that the State's public school financing system was unconstitutional.[1]

Mindful of the fundamental value of education in our democratic society, we agreed with plaintiffs' interpretation of the Education Article. The State must ensure that New York's public schools are able to teach "the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury" (86 NY2d at 316). In assessing adequacy of education, this standard is the constitutional minimum or floor that we had acknowledged earlier, in *Board of Educ., Levittown Union Free School Dist. v Nyquist* (57 NY2d 27, 47-48 [1982]). Accordingly, we held that plaintiffs' cause of action under the Education Article survived a motion to dismiss (86 NY2d at 318-319), reminding plaintiffs that they would "have to establish a causal link between the present funding system and any proven failure to provide a sound basic education to New York City school children" (86 NY2d at 318).

Plaintiffs succeeded in establishing that causal link, in a 1999-2000 trial concerning the 1997-1998 school year. In 2003, we decided that this trial record supports the conclusion that, because of inadequate funding for their public schools, children in New York City "are not receiving the constitutionally-mandated opportunity for a sound basic education" (*Campaign for Fiscal Equity v State of New York*, 100 NY2d 893, 919 [2003] [*CFE II*]). In *CFE I*, we had understood a sound basic education as teaching skills that enable students to undertake civil re-

---

1. In a companion case, *City of New York v State of New York* (86 NY2d 286 [1995]), we affirmed the Appellate Division's dismissal of an action by the City of New York, the New York City Board of Education, the Mayor of New York City, and the Chancellor of the New York City School District, and held that these municipal plaintiffs lacked capacity to bring an action against the State.

sponsibilities meaningfully. In *CFE II*, we defined "sound basic education" more exactly, as the "opportunity for a meaningful *high school* education, one which prepares [children] to function productively as civic participants" (100 NY2d at 908 [emphasis added]).

We determined that New York City public schools provided inadequate teaching, because they were unable to attract and retain qualified teachers (100 NY2d at 909-911). They were deficient in at least two instrumentalities of learning: libraries and computers (100 NY2d at 913). Moreover, although plaintiffs had not proven "a measurable correlation between building disrepair and student performance, in general" (100 NY2d at 911), they sufficiently demonstrated "that large class sizes negatively affect student performance in New York City public schools" (100 NY2d at 912).

Whether measured by "inputs" or by "outputs," i.e. school completion rates and test results (100 NY2d at 914-919), New York City schoolchildren, we determined, were not receiving the opportunity for a sound basic education. Finally, we concluded that plaintiffs had established the causation element of their claim by showing that increased funding can provide better teachers, facilities and instrumentalities of learning, and that such improved inputs in turn yield better student performance (100 NY2d at 919-925).

Accordingly we directed the State to ensure, by means of "[r]eforms to the current system of financing school funding and managing schools . . . that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education" (100 NY2d at 930). Noting that "the political process allocates to City schools a share of state aid that does not bear a perceptible relation to the needs of City students" (*id.*), we instructed the State to ascertain the actual cost of providing a sound basic education in New York City, rather than the state as a whole (*id.*). We also held that "the new scheme should ensure a system of accountability to measure whether the reforms actually provide the opportunity for a sound basic education" (*id.*). We gave the State a deadline of July 30, 2004 by which to implement the necessary measures (*id.*) and remitted to Supreme Court for further proceedings in accordance with our opinion (100 NY2d at 932).

Within a matter of weeks, Governor Pataki issued an executive order creating the New York State Commission on Educa-

tion Reform, charged with recommending, to the Executive and the Legislature, education financing and other reforms that would ensure that all children in New York State have an opportunity to obtain a sound basic education. The Commission, chaired by Frank G. Zarb, published its final report on March 29, 2004.

The Zarb Commission retained Standard and Poor's (S & P) School Evaluation Services to calculate the additional spending required to provide a sound basic education, directing S & P to use a "Successful Schools" model that studies the expenditures of school districts with a proven track record of high student performance. The method had been used by the New York State Board of Regents in its Proposal on State Aid to School Districts for 2004-05.

The Zarb Commission developed three alternative criteria for identifying successful school districts. One option was based on New York's 2007-2008 performance standard set in accordance with the federal No Child Left Behind Act of 2001. Another was similar to the first but substituted the 2006-2007 performance standard. The third criterion was the same approach to identifying successful schools that the Board of Regents had used; it picked out school districts—281 of 699—in which at least 80% of the students performed at or above a proficient level, over a three-year period, in seven tests required by the Board of Regents: two fourth-grade examinations and five examinations required for high school graduation.[2]

Reasoning that not all successful schools operate in a manner that is economical, the Zarb Commission instructed S & P to apply a cost-effectiveness filter: once successful school districts were identified by the methods just described, they were to be ranked according to expenditures and those in the lower-spending half were to be used to create an average. The Board of Regents had noted the necessity for applying such an efficiency filter, because "districts that perform at high levels often enjoy a very substantial wealth base, and therefore also spend at very high per pupil[ ] levels" (Regents Proposal on State Aid to School Districts for 2004-05, at 48, available on the Internet at <http://emsc32.nysed.gov/stateaidworkgroup/2004-

---

**2.** S & P added a fourth approach, which identified 102 of the State's highest-performing school districts, measured on the basis of 15 indicators, including passing rates on state tests, graduation rates and high school enrollment retention rates.

05%20RSAP/RSAP0405.htm>, cached at <http://www. nycourts.gov/reporter/webdocs/Regents_Item.htm>).

Drawing on an extensive review of pertinent research literature, S & P applied three weightings to the resulting base expenditures, in order to take into account the greater spending required for students with special needs. The coefficients by which the base expenditures were multiplied were 2.1 for students with disabilities, 1.35 for economically disadvantaged students, and 1.2 for students with limited English proficiency. S & P cautioned that it was not in a position to recommend explicitly the set of weightings it applied.

Adjustments were also made to account for the local purchasing power of the dollar, using two, alternative cost indices, the New York Regional Cost Index (NY RCI), provided by the New York State Education Department and based on differences in labor market costs, and the Geographic Cost of Education Index (GCEI), provided by the National Center for Education Statistics. The latter index was developed by Jay Chambers, one of the principal authors of the New York Adequacy Study, a cost analysis project cosponsored by plaintiff CFE in 2003-2004. The GCEI attempts to measure the attractiveness of employment within a particular district, one of the key determinants of the cost of providing education. S & P used what was then the most recent, publicly available version of the GCEI, a 1997 update by Chambers. Finally, amounts were adjusted for inflation to reflect January 2004 purchasing power.

S & P thus calculated "sound basic education" spending estimates for each school district, using the two regional cost indices and the four alternative criteria for identifying successful school districts. The spending estimates did not include capital, debt or transportation costs. Finally, these figures were compared with amounts actually spent in 2002-2003, in order to identify "spending gaps."

Applying the GCEI, the estimated spending gaps for New York City ranged from $1.93 billion to $2.53 billion and the statewide spending gaps from $2.45 billion to $3.39 billion, depending on which criterion for successful school districts was used. (New York City's spending gap thus comprised 74% to 79% of the State's total gap.) When the NY RCI was applied, the estimated spending gaps were larger, ranging from $4.05 billion to $4.69 billion for New York City, and $4.61 billion to

$5.57 billion statewide.[3] Applying the GCEI and the Board of Regents approach to identifying successful schools, the spending gap for New York City, in 2004 dollars, was $1.93 billion.

Governor Pataki convened the Legislature in extraordinary session on July 20, 2004, and proposed a program bill to the Senate, incorporating the Zarb Commission's methodology. The Senate passed an amended version of the bill. Ultimately, the legislation was not enacted. In both versions of the bill, the Legislature would have found that the actual costs of providing a sound basic education should be determined using the Board of Regents approach to identifying successful schools (which had picked out 281 of 699 school districts), the S & P weightings for students with special needs, the GCEI, and the cost-effectiveness filter (*see* 2004 Extraordinary Session NY Senate Bill S 1-A, § 1, at 2 [July 20, 2004]; 2004 NY Senate Bill S 7684-B, § 2, at 2 [July 20, 2004]).

In other words, Governor Pataki and the Senate endorsed the approach that generated a minimum figure of $1.93 billion as the estimated spending gap in operating expenses for New York City. In his State Education Reform Plan, submitted in the course of this litigation, the Governor concluded that "the S&P analysis as adopted by the Zarb Commission and by State defendants determined that $2.5 billion in additional revenues statewide (equating to $1.9 billion in New York City) was a valid determination of the cost of providing a sound basic education in New York City" (State Education Reform Plan, at 14 [Aug. 12, 2004]).

In his program bill memorandum, Governor Pataki made it clear that he intended New York City schools to receive additional funding that exceeded the minimum cost of a sound basic education. Proposals for a Dedicated State Fund for Sound Basic Education and for a New York City local state aid match would, when coupled with projected increases in state school aid and federal aid, generate "approximately $4.7 billion in additional support over the next five years" (Governor's Program Bill Mem in Support of 2004 Extraordinary Session NY Senate Bill S 1-A, at 4). As noted, the proposed legislation was not enacted. The Legislature, however, passed a bill on August 10,

---

**3.** Based on these S & P estimates and after reviewing the results of plaintiff CFE's New York Adequacy Study and the Board of Regents Proposal on State Aid to School Districts, the Zarb Commission recommended a five-year phase-in of a *statewide* amount of $2.5 billion to $5.6 billion from state, local and federal sources.

2004, providing $300 million in additional education aid to New York City.

Once the deadline of July 30, 2004 we had set in *CFE II* had passed, Supreme Court set out to determine whether the measures we had declared necessary had been carried out. It appointed a blue-ribbon panel of referees "to hear and report with recommendations" on whether the steps taken by the State brought compliance with *CFE II*.

The Referees conducted numerous hearings, in which they heard from many witnesses, including the Mayor of New York City, the Chancellor of the New York City School District, and representatives of the New York State Division of the Budget and Education Department. They received extensive written submissions, including four compliance plans: the Governor's State Education Reform Plan, drawing on the Zarb Commission; plaintiffs' Plan for Compliance, which included the New York Adequacy Study, a cost analysis conducted by the American Institutes for Research (AIR) and Management Analysis and Planning, Inc. (MAP); the Regents Proposal on State Aid to School Districts for 2004-05; and a proposal from the City of New York.

Although they accepted the "successful school districts" methodology of the Zarb Commission, the Referees rejected its cost-effectiveness filter, used a 1.5 weighting for economically disadvantaged students in place of the S & P coefficient of 1.35, and insisted on the use of an updated GCEI, prepared for plaintiff CFE's New York Adequacy Study. They concluded that the spending gap in New York City was $5.63 billion in 2004-2005 dollars, rejecting the State's contention that additional funding in the amount of $1.93 billion would ensure the opportunity for a sound basic education in New York City's public schools.

The Referees adopted CFE's capital funding program, "Building Requires Immediate Capital for Kids" (BRICKS), recommending that the State be required to ensure that $9.179 billion in 2004-2005 dollars would be available as funding for capital improvements over the following five years. Additionally, the Referees recommended that costing-out studies be carried out every four years, supervised by the Board of Regents, "until it becomes clear that reforms to the State's education finance formulas have rendered such studies no longer necessary to assure all New York City students the opportunity for a sound ba-

sic education" (Report and Recommendations of the Judicial Referees, at 39).

On the question of accountability, the Referees concluded that existing state systems, identifying schools that perform poorly and sanctioning failing schools, already provide adequate accountability, and that no new Office of Educational Accountability should be created. They recommended, however, that the current system should be enhanced by the development of a comprehensive "sound basic education" plan by the New York City Department of Education.

Supreme Court confirmed the Judicial Referees' Report and Recommendations. The Appellate Division vacated that confirmation (29 AD3d 175 [2006]). It found support in the record for the State's "cost-effectiveness" approach, as well as for its weighting for economically disadvantaged students. Noting that record support, the Appellate Division observed that

> "Supreme Court should not have substituted the Referees' opinion for that of the State . . . [and] converted a factor that was arguable and reasonable for the Legislature and Governor to consider into an incontrovertible fact. As long as the State's choices remained within the range of professionally accepted practices in determining the costs of a sound basic education, Supreme Court should have left the conclusions for legislative and gubernatorial consideration and determination." (29 AD3d at 184.)

Citing Governor Pataki's proposal to increase funding of the New York City School District by $4.7 billion (over a period of five years), the Appellate Division directed the Governor and Legislature to appropriate at least $4.7 billion in additional operating funds (phased in over four years).[4] The Appellate Division also directed the Governor and Legislature to "implement a capital improvement plan that expends $9.179 billion

---

4. Specifically, the Appellate Division directed that
   "in enacting a budget for the fiscal year commencing April 1, 2006, the Governor and the Legislature consider, as within the range of constitutionally required funding for the New York City School District, as demonstrated by this record, the proposed funding plan of at least $4.7 billion in additional annual operating funds, and the Referees' recommended annual expenditure of $5.63 billion, or an amount in between, phased in over four years, and that they appropriate such amount, in order to remedy the constitutional deprivations found in *CFE II*" (29 AD3d at 191).

over the next five years or otherwise satisfies the city schools' constitutionally recognized capital needs" (29 AD3d at 191).

Plaintiffs CFE et al. appeal pursuant to CPLR 5601 (a) and (b) (1). The state defendants cross-appeal under CPLR 5601 (b) (1).

## II.

■ The Judicial Referees' Report, dated November 30, 2004, commands our attention as well as our respect; it is likely that much of value may be learned from the Referees' careful consideration of methods of ascertaining the cost of a sound basic education and reforms to the current system of public school financing. Nevertheless, we hold that Supreme Court erred by, in effect, commissioning a de novo review of the compliance question. The role of the courts is not, as Supreme Court assumed, to determine the best way to calculate the cost of a sound basic education in New York City schools, but to determine whether the State's proposed calculation of that cost is rational. Supreme Court should not have endorsed an examination in which the cost of a sound basic education in New York was calculated anew, when the state budget plan had already reasonably calculated that cost. In this respect, we agree with the Appellate Division. It was error to confirm the Referees' Report.

■■ We differ from the Appellate Division, however, in two respects. First, we observe that the state plan found that the cost of providing a sound basic education in New York City was $1.93 billion in additional annual operating funds, and that Governor Pataki's proposal to provide $4.7 billion in additional funding amounted to a policy choice to exceed the constitutional minimum. Second, in light of recently enacted legislation designed to allow the State to remedy inadequacies in New York City schools facilities, we reject as unnecessary the Appellate Division's directive regarding capital improvement.

Therefore, we modify the order of the Appellate Division, in two ways. We declare that the constitutionally required funding for the New York City School District includes, as demonstrated by this record, additional operating funds in the amount of $1.93 billion, adjusted with reference to the latest version of the GCEI and inflation since 2004. We vacate the requirement that the Governor and the Legislature implement a capital improvement plan that either expends $9.179 billion over the following five years "or otherwise satisfies the city schools' constitutionally recognized capital needs." As modified, we affirm.

## III.

In *CFE II*, we expressed the necessity for courts to tread carefully when asked to evaluate state financing plans. On the one hand, the Judiciary has a duty "to defer to the Legislature in matters of policymaking, particularly in a matter so vital as education financing, which has as well a core element of local control. We have neither the authority, nor the ability, nor the will, to micromanage education financing." (100 NY2d at 925.) On the other hand, "it is the province of the Judicial branch to define, and safeguard, rights provided by the New York State Constitution, and order redress for violation of them" (*id.*).

The need for deference, where appropriate, is no less important for this Court than it is for the Judiciary as a whole. We are the ultimate arbiters of our State Constitution (*see e.g. Cohen v State of New York*, 94 NY2d 1, 11 [1999]). Yet, in fashioning specific remedies for constitutional violations, we must avoid intrusion on the primary domain of another branch of government. We have often spoken of this tension between our responsibility to safeguard rights and the necessary deference of the courts to the policies of the Legislature. "While it is within the power of the judiciary to declare the vested rights of a specifically protected class of individuals, in a fashion recognized by statute . . . the manner by which the State addresses complex societal and governmental issues is a subject left to the discretion of the political branches of government" (*Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo*, 64 NY2d 233, 239-240 [1984] [citations omitted]). When we review the acts of the Legislature and the Executive, we do so to protect rights, not to make policy.

Our deference to the Legislature's education financing plans is justified not only by prudent and practical hesitation in light of the limited access of the Judiciary "to the controlling economic and social facts," but also by our abiding "respect for the separation of powers upon which our system of government is based" (*Matter of 89 Christopher v Joy*, 35 NY2d 213, 220 [1974]). We cannot "intrude upon the policy-making and discretionary decisions that are reserved to the legislative and executive branches" (*Klostermann v Cuomo*, 61 NY2d 525, 541 [1984]).

Deference to the Legislature is especially necessary where it is the State's budget plan that is being questioned. Devising a

state budget is a prerogative of the Legislature and Executive; the Judiciary should not usurp this power. The legislative and executive branches of government are in a far better position than the Judiciary to determine funding needs throughout the state and priorities for the allocation of the State's resources.

We have therefore spoken of the "formidable burden" of proof imposed on "one who attacks the budget plan" (*Wein v Carey*, 41 NY2d 498, 505 [1977]). Indeed, the burden is

> "realistically, impossible as to some categories of estimates. But there are some estimates that could be demonstrated on their face to be unreasonable. An extreme example would be a tripling of the estimates of personal income tax revenue, without a change in the tax rate, in a period in which the economy appears to be on a plateau or in decline." (*Id.*)

The illustrations we gave in *Wein v Carey*, while extreme, were meant to show how patently *irrational* a state financing plan must be, before judicial deference will give way. Judicial intervention in the state budget "may be invoked only in the narrowest of instances" (*id.*).

When we remitted in *CFE II*, we did so in order that Supreme Court would determine, when our deadline had passed, whether the State had implemented the reforms we required—legislation that would ensure that New York City schools have the resources necessary for providing the opportunity for a sound basic education and that would ensure accountability. *CFE II* called for the State to present evidence of its reforms, both predating *CFE II* (*see* 100 NY2d at 927) and following *CFE II*, and for Supreme Court to determine whether they satisfied our directives.

In light of our language in *CFE II* and our jurisprudence as a whole concerning deference to the Legislature in matters of policymaking, it was incumbent upon Supreme Court to begin by making a finding as to whether the State's estimate of the cost of providing a sound basic education in New York City was a *reasonable* estimate. Then the court should have proceeded to determine whether the state plan, as of July 30, 2004, incorporated that sound basic education expenditure in its proposed budget and would, if enacted, ensure a system of accountability. Supreme Court should not have provided a panel of referees with a mandate to make *recommendations* as between compli-

30

ance proposals—the State's, the plaintiffs', the City's, the Regents'. The State, not Supreme Court, was ordered to ascertain the cost of a sound basic education in New York City.

## IV.

We do not believe that Governor Pataki's proposed State Education Reform Plan was unreasonable. In particular, we do not find irrational the Governor's acceptance of the Board of Regents approach to identifying successful schools, the S & P weightings for students with special needs and the cost-effectiveness filter (2004 Extraordinary Session NY Senate Bill S 1-A, § 1, at 2 [July 20, 2004]). As a result, we do not find unreasonable the assertion that "$2.5 billion in additional revenues statewide (equating to $1.9 billion in New York City) was a valid determination of the cost of providing a sound basic education in New York City" (State Education Reform Plan, at 14 [Aug. 12, 2004]). There is substantial record support for that statement.

First, the use of the cost-effectiveness filter is rationally defensible. The variation in spending between New York school districts is very large.[5] As S & P explained, averaging the expenditures of *all* successful schools would

> "mask a considerable range of per-pupil spending among the individual districts . . . If the concept of 'adequacy' means spending no less, but not necessarily more, than is necessary to produce high achievement levels, then there is reasonable cause to adjust the base expenditure by a measure of *cost effectiveness*. This can be done by ranking the successful districts under each scenario by their base expenditure, and computing the average of the lowest 50% (in terms of spending), which is the same approach used by the New York Board of Regents in its recent study of educational costs. An analysis of the average achievement levels of the lower-spending half of districts shows that they closely resemble the average achievement levels of the upper-spending half of districts . . . ." (Standard &

---

**5.** Indeed this variation was the focus of *Board of Educ., Levittown Union Free School Dist. v Nyquist* (57 NY2d 27 [1982]); we held that the State's public school financing system did not violate the Equal Protection clauses of the state and federal constitutions, despite wide spending disparities among school districts.

Poor's Resource Adequacy Study for the New York State Commission on Education Reform, at 46-47 [Mar. 2004].)

The essential premise of the cost-effectiveness filter is that the higher-spending half of the successful districts is spending more than the constitutional minimum—either because those districts spend less efficiently than some others or because they have chosen to do more for their students than the Constitution requires. The State, in adopting S & P's approach, implicitly concluded that New York City could attain minimal constitutional standards while spending less than this higher-spending group of successful districts. The premise, and the conclusion, are no doubt debatable, but we cannot say they are irrational, and they are therefore entitled to deference from the courts.

The S & P weightings for children with special needs also have record support. While S & P did not recommend any particular weighting over another, the coefficients that S & P applied were drawn from an extensive review of relevant research. Indeed the pertinent footnote to S & P's Resource Adequacy Study cites no fewer than 37 articles, reports and other scholarly works (Standard & Poor's Resource Adequacy Study for the New York State Commission on Education Reform, n 16, at 89-92 [Mar. 2004]).

The S & P calculations—applying a 2.1 weighting for students with disabilities, 1.35 for economically disadvantaged students, and 1.2 for students with limited English proficiency, and reaching the conclusion that the spending gap for the New York City School District is $1.93 billion—were reasonable. Although we recognize that legitimate arguments can be made for raising the coefficient for economically disadvantaged students to 1.5, we do not believe that the figure of 1.35 lacks grounding in prudent reason.

Accordingly, we declare that the constitutionally required funding for the New York City School District includes additional operating funds in the amount of $1.93 billion, adjusted with reference to the latest version of the GCEI and inflation since 2004.

## V.

Turning to capital improvements, we emphasize again, as we did in *CFE I*, that New York's public schoolchildren "are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit chil-

dren to learn" (86 NY2d at 317). The Appellate Division directed the Governor and the Legislature to implement a capital improvement plan that either expends $9.179 billion over the following five years "or otherwise satisfies the city schools' constitutionally recognized capital needs" (29 AD3d at 191). In choosing its words thus, the Appellate Division was perhaps mindful of the fact that in *CFE II* we did not expressly require the State to calculate the amount of capital funding necessary to remedy deficiencies in facilities, with the result that the State did not carry out a costing-out study for capital funding needs in the way it did for operating costs.

■ The part of the Appellate Division order that requires a capital improvement plan should be vacated as unnecessary. In 2006, the Legislature set forth a capital construction program totaling $2.6 billion, that includes $1.8 billion for the New York City School District (L 2006, ch 58, part A-2; L 2006, ch 61, part I). Crucially, the Legislature increased the cap for the New York City Transitional Finance Authority by $9.4 billion to help fund the cost of capital improvements, and permitted New York City to pledge future state building aid in order to repay borrowed funds (L 2006, ch 58, part A-3). We are of course bound to decide this case on the record before us. But since the parties now agree that the funds envisaged by the Legislature this year would be sufficient to remedy facilities deficiencies, we believe that there is no need for further judicial direction.

■ Finally, insofar as the Appellate Division vacated Supreme Court's order confirming the Referees' Report, it struck Supreme Court's call for state costing-out studies every four years and its requirement that the New York City Department of Education prepare a comprehensive "sound basic education" plan, to ensure accountability. We agree with these results. In particular, we agree with the City of New York, an amicus in this case, that a new and costly layer of city bureaucracy is not constitutionally required. It is undisputed that there are minimally adequate accountability mechanisms now in place for the evaluation of New York schools (including the Schools Under Registration Review process and the state standards required by the federal No Child Left Behind Act of 2001).

Accordingly, the order of the Appellate Division should be modified, without costs, by granting judgment declaring in accordance with this opinion and, as so modified, affirmed.

ROSENBLATT, J. (concurring). I join the majority in its ratio-

nale and result, but write separately to emphasize that my vote should not be construed as concluding that $1.93 billion, as adjusted, is necessarily the proper additional budgetary amount to provide New York City schools, or that $2.45 billion is the amount that should be budgeted statewide. These figures were determined by a commission designated by the State as reflecting the constitutional *minimum* for a sound basic education. I join the majority because I agree that Supreme Court should not have directed the referees' recalculation, considering that the state budget plan had already calculated the amount in a way that, as a matter of law, was not arbitrary or irrational.

That does not mean that the State is limited to the minimum, or "floor," of what it takes to provide a sound basic education. Judging by Governor Pataki's higher budgeting and the similarly heartening indications that Governor-elect Spitzer will continue in a direction higher than the minimum, there is every indication that the amounts dedicated will be well above the constitutional floor. When it comes to educating its children, New York State will not likely content itself with the minimum. Indeed, after this suit was initiated the State provided for an additional $9 billion investment in capital improvements for the City's schools. How much more it can and should spend, however, is a matter for the political branches, which will be free to avail themselves of the valuable work performed by the distinguished panel of referees.

I also emphasize, most importantly, that this lawsuit has consequences beyond New York City and that there are, no doubt, other school districts that should benefit from increased budgets. This requires a statewide approach that is also best left to the Executive and Legislature.

Chief Judge KAYE (concurring in part and dissenting in part). Recognizing that we have neither the authority, nor the ability, nor the will to micromanage education financing, in *Campaign for Fiscal Equity v State of New York* (100 NY2d 893, 925 [2003] [*CFE II*]) the Court demarcated standards that must be met, but left it to defendants to come into compliance, affording them more than a year to do so. Regrettably, our trust was misplaced. Today, more than three years later—and more than 13 years after this litigation began—defendants still have failed to fund the New York City public schools adequately. Having failed to satisfy their responsibility, defendants now compel this Court to determine the specific steps that must be taken to remedy the undisputed constitutional violation. Also regret-

tably, I must dissent because the majority does not resolve the inadequate funding of the New York City public schools and reaches a result that is well below what the governmental actors themselves had concluded was required.

Although the dollar differences that separate the majority and dissent are great, our actual points of difference are only two: first, the deference owed, and second, the rationality of two factors used by defendants to calculate the cost of a sound basic education.[1]

## I. The Issue of Deference

The heart of the majority writing is that substantial deference is owed to the executive and legislative branches of government, particularly in matters of budgeting and policymaking (*see* majority op at 28-30). I agree wholeheartedly. When the Executive and the Legislature have acted together on matters within their particular province, the courts should indeed tread lightly. That, however, is not what happened here. There is no state budget plan for bringing the schools into constitutional compliance; that is precisely the problem. When, as here, the Executive and the Legislature are specifically at odds as to the cost of providing the opportunity for a sound basic education to New York City schoolchildren, the approach of a single branch, rejected by another, cannot legitimately be considered "the State's estimate" (majority op at 29), and is entitled to no special weight.

In *CFE II* we directed defendants to ascertain the actual cost of providing a sound basic education in New York City; to ensure that every city school have the resources necessary to provide the opportunity for a sound basic education; and to ensure a system of accountability to measure whether the reforms actually provide the opportunity for a sound basic education. Although there is no dispute that defendants failed to comply with our second directive, I cannot agree with the majority that they complied with our first.

To be sure, the Governor, in undertaking to determine the cost of a sound basic education, and in proposing $4.7 billion in increased annual funding for the New York City public schools, took important steps toward that objective. And in most cases, of course, we can assume that the Governor, in whom the exec-

---

1. I concur with the majority that no further judicial direction is required with respect to capital improvements or accountability.

utive power is vested, speaks for the State. But not so here. The enactment of an appropriation bill that ensures adequate educational funding requires agreement among the Governor and both houses of the Legislature, and plainly that has not occurred.[2]

As the deadline for compliance approached, defendants advised the trial court, to which we had remitted the case, of the actions they had by then undertaken to satisfy this Court's order. Based on defendants' failure to fulfill the *CFE II* mandate, the court appointed three referees

> "to hear and report with recommendations on what measures defendants have taken to follow the *[CFE II]* directives and bring this State's school funding mechanism into constitutional compliance insofar as it affects the New York City School System. The referees shall also identify the areas, if any, in which such compliance is lacking."

Even today, it is hard to see what alternative the court had. The Executive and Legislature were at loggerheads—there was no agreed amount to be implemented.

The majority faults the trial court and referees for undertaking to determine the actual cost of a sound basic education, believing instead that calculations proffered by certain of the defendants should have been beyond question. For more than 200 years, however, it has been the province and duty of the judicial branch to enforce compliance with constitutional norms, including (when necessary) as against the other branches of government. Defendants' continued failure to cure the violation properly obligated the courts to determine the extent of noncompliance and to direct a remedy.

When courts undertake to resolve a controversy that others have brought before them, they appropriately resort to the tools of the judicial trade—testimony, evidence and fact-finding. The referees thus conducted seven days of evidentiary hearings on the primary question before them—the actual cost of a sound basic education for New York City schoolchildren. Based on the testimony of 15 witnesses, expert evidence, and extensive brief-

---

**2.** Indeed, our State Constitution places the obligation to provide all the state's children with a sound basic education squarely on the Legislature: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (NY Const, art XI, § 1 [the Education Article]).

ing and argument, they rationally determined that the actual cost of providing a sound basic education in New York City required an annual increase in operational funding of $5.63 billion, calculated in 2004-2005 dollars. The Appellate Division, too, determined that constitutional compliance required additional annual expenditures of between $4.7 billion and $5.63 billion. The majority, however, rejects the findings of the referees, and indeed the very process undertaken by the courts, and instead accepts at face value $1.93 billion as sufficient to satisfy the Education Article.

The origins of that number are instructive. In response to our decision in *CFE II*, the Governor established the New York State Commission on Education Reform—the Zarb Commission—charged with, among other things, "study[ing] and mak[ing] recommendations regarding . . . [t]he actual cost of providing all children the opportunity to acquire a sound basic education in the public schools of the State of New York" (Executive Order [Pataki] No. 131 [9 NYCRR 5.131]). The Commission, in turn, retained Standard & Poor's School Evaluation Services, which produced a lengthy Resource Adequacy Study offering a wide variety of possible amounts of education spending, each based on different assumptions and variables as to the desired level of educational achievement and the costs required to attain it.

Inasmuch as the Commission was asked to study statewide costs, even though this Court's mandate had been limited to New York City, Standard & Poor's used each scenario to calculate both statewide amounts and their citywide equivalents. With respect to New York City, Standard & Poor's calculated resource gaps—defined as the difference between the amount actually spent in the most recently completed fiscal year and the amount that would be required to fund the particular scenario—ranging from $1.93 billion to $7.28 billion in core operating expenditures.[3] In so doing, however, Standard & Poor's itself repeatedly made clear that it "does not recommend any spending level or the adoption of any particular achievement scenario" (Standard & Poor's School Evaluation Services, Resource Adequacy Study for the New York State Commission on Education Reform, at 23 [2004]). Relying on the Resource Adequacy Study, and specifically endorsing the "cost effectiveness" vari-

---

3. "Core operations" exclude debt service and capital and transportation spending.

able considered by Standard & Poor's, the Commission similarly reported a wide range to the Governor—that is, from $2.45 billion to $5.57 billion statewide, which translated to between $1.93 billion and $4.69 billion for the City—concluding that "[t]he State's elected leaders should make a choice of funding within this range" (New York State Commission on Education Reform, Final Report, at 24 [2004]).

At no time did either Standard & Poor's or the Commission undertake to conclude that *any* particular amount within the proffered ranges was sufficient to ensure the opportunity for a sound basic education to all New York City schoolchildren (*see* Standard & Poor's School Evaluation Services, Resource Adequacy Study for the New York State Commission on Education Reform, at 12-13 [2004] ["Standard & Poor's does not recommend any particular spending level; nor does it define a 'sound, basic education'"]; New York State Commission on Education Reform, Final Report, at 24 [2004] ["The Commission believes the decision on which educational standard to use should be left to the State's elected leaders"]). Nevertheless, the majority accepts the calculations performed in the Resource Adequacy Study as sacrosanct, and from there concludes that the lowest number reached using any possible combination of variables must equal the amount needed to provide a sound basic education.

Even defendants did not recommend these numbers. Rather, defendants, through the Attorney General, submitted to the referees an "education plan prepared by Governor Pataki setting forth his proposal for complying with the June 23, 2003 decision of the Court of Appeals in this action." The Governor's plan proposed additional annual operating funds for New York City of $4.7 billion, and $8 billion statewide. As the Attorney General wrote in a letter to the referees:

> "Governor Pataki is a named defendant in this action, and this office therefore is presenting the plan prepared by the Governor, as his counsel, and a description of that plan as prepared by the Governor's office. We also note, however, that the decision of the Court of Appeals requires the enactment of legislation by the State of New York, and this office is the institutional counsel for the State.
>
> "Unfortunately, the two houses of the Legislature and the Governor have not been able to agree upon a single unified plan for submission to this panel."

On this record, the $1.93 billion figure is not entitled to special deference.

## II. The Issue of Rationality

The $1.93 billion now embraced by the majority is, moreover, based on two unsustainable factors. When those factors are properly adjusted, the resultant cost of a sound basic education, as calculated by Standard & Poor's, is identical to that reached by the referees and accepted by the trial court—a determination that should therefore be upheld as rationally based.

In conducting its study, Standard & Poor's, as instructed by the Commission, utilized the "successful schools and districts" model for calculating per-pupil expenditures—one of three distinct methodologies typically used by experts in education policy and finance. No party disputes the legitimacy of the successful schools method as a means for determining the cost of a sound basic education. By using this method, Standard & Poor's was able to calculate a range of numbers that varied according to choices made as to four distinct factors—first, the standard for measuring a successful school district; second, the additional expenditures necessitated by special needs students; third, the use of a cost filter; and fourth, the manner of converting "standardized" education dollars into New York City dollars.

With respect to the first factor, Standard & Poor's made a set of calculations using four different academic achievement standards for identifying a successful school district, and again the parties agree, and the referees found, that satisfaction of the Regents Criteria provides an appropriate standard for measuring a successful school. Nor is there any dispute as to the fourth factor—the proper conversion of state education dollars into New York City dollars. Inasmuch as the purchasing power of a dollar varies across the state, and the successful schools method examined all of the school districts in the state, Standard & Poor's offered two alternative regional cost adjustment indices to determine the cost in New York City dollars: (1) the "New York Regional Cost Index," provided by the State Education Department; and (2) the "Geographic Cost of Education Index" (GCEI), provided by the National Center for Education Statis-

tics. The referees found, and the parties agree, that use of the GCEI was appropriate.[4]

The difference—a huge dollar difference—centers on the second and third factors: the proper weighting adjustments for special needs students, and the use of a 50% cost reduction filter.

## A. The Low-Income Weighting

A successful schools analysis produces "base expenditures," which are estimated costs per pupil. However, such base expenditures must then be multiplied by "weightings" for students with special needs, who require such costly accommodations as differentiated curricula, smaller class sizes, assistive technology and classroom aides. Standard & Poor's assigned a weighting of 2.1 to students with disabilities (special-education students); 1.35 to economically disadvantaged students; and 1.2 to students with limited English proficiency. Although the parties and referees agree that the special-education and English-language weightings were appropriate, the record reflects that the 1.35 low-income weighting applied by Standard & Poor's— according to which $1.35 must be allocated to students in poverty for every dollar spent on a student not in poverty—was irrational and cannot be sustained.

Defendants' principal rationale for choosing this weighting—a choice that drew considerable criticism from the witnesses and amici—was that the Standard & Poor's study had identified 1.35 as the proper adjustment for educating economically disadvantaged students. But Standard & Poor's had in fact emphasized that 1.35 was simply a figure that it had "drawn from a review of research literature on the coefficients that education agencies tend to use in practice," and that "insufficient empirical evidence exists in New York to determine how much additional funding is actually needed for different categories of students with special needs to consistently perform at intended achievement levels" (Standard & Poor's School Evaluation Services, Resource Adequacy Study for the New York State

4. However, the particular GCEI used by Standard & Poor's in its Resource Adequacy Study was outdated. Accordingly, as the majority recognizes and defendants concede, the $1.93 billion ordered by the Court must be adjusted using the correct GCEI.

Commission on Education Reform, at 8-9 [2004]).[5] As a result, Standard & Poor's made clear that its study "does not explicitly recommend a particular set of weightings." (*Id.*)

Unlike Standard & Poor's, the Regents, in determining that a higher poverty weighting was required, had focused on the specific circumstances of New York City schools, including an especially heavy concentration of high-needs students, very low graduation rates, large classes and a disproportionate number of schools in need of improvement, and thereby determined that the appropriate low-income weighting for New York City was 1.8. With respect to the state as a whole, the Regents recommended weightings for low-income students ranging from 1.5 to 2.0, depending on the concentration of poverty in the district.

Because the Standard & Poor's weighting of 1.35 for low-income students was not focused on the specific circumstances of New York City schools, its use to determine the actual cost of providing a sound basic education to economically disadvantaged New York City students was irrational, as the referees found. The referees thus properly determined that a poverty weighting of at least 1.5—the lower end of the range proposed by the Regents—must instead be used.

### B. The 50% Cost Filter

Finally, as endorsed by the Zarb Commission, Standard & Poor's applied a "cost effectiveness filter" of 50% in an alleged effort to screen out successful school districts that either spent money inefficiently or spent more than was necessary to provide the opportunity for a sound basic education. Under that approach, Standard & Poor's considered the average expenditures of only the lower-spending half of successful school districts in New York State, thereby excluding from the analysis 140 of the 281 successful school districts meeting the Regents Criteria standard.

Multiple witnesses and amici heavily criticized this filter. Indeed, several testifying witnesses criticized the use of *any* cost reduction filter, and others would have used an approach substantially different from the one adopted by defendants, such as simply eliminating the highest- and lowest-spending 5%

---

5. Evidence in the record indicated that such nationally derived weightings generally "result from guesses or policy decisions based on the amount of available funding" and "are essentially arbitrary and do not reflect the actual costs of providing adequate educational opportunities to students with special needs."

of districts as "outliers." Defendants' own expert, Dr. Robert M. Palaich, testified that his own firm would not use the 50% filter, and there was no evidence offered that this filter is generally accepted by experts in educational finance or, more fundamentally, that the higher-spending districts that were excluded from defendants' analysis by the cost filter were in fact inefficient. Inasmuch as defendants made no attempt to determine why some successful schools spent less per pupil than others, the assumption that this must have been because the lower-spending schools were more efficient is utterly speculative. Indeed, certain expert amici posited that the lower spending in the selected schools might instead have been due to low wage costs and a low concentration of disadvantaged students, not to efficiency.

Only one decisionmaker anywhere in the country—the New Hampshire Legislature—has ever implemented a 50% cost reduction filter. But as even defendants acknowledge, "in New Hampshire it appears that the efficiency factor was selected to drive costs down" to a predetermined amount; it was not based on the expertise of any education finance experts. The 50% number not only is wholly arbitrary, but also has the effect of eliminating most of the school districts in Westchester and Nassau, the two counties that border New York City and thus most resemble the City in the concentration of students who are not English proficient and in the higher regional costs, particularly in hiring and retaining capable teachers. Accordingly, the 50% cost filter was properly rejected by the referees.

Defendants nevertheless defend the use of the 50% filter on the ground that the State Board of Regents also used it in its own budget proposal, submitted to the referees. But if deference to the Regents is called for with respect to the cost filter, surely it must also be shown with respect to the appropriate poverty weighting. The Regents, as noted, recommended a weighting for New York City low-income students of 1.8. Application of a 1.8 low-income weighting—even with the 50% cost filter—would result in a resource gap of $5.25 billion, almost identical to the $5.26 billion gap found by the referees.[6]

---

6. The $5.63 billion calculated by the referees reflected both the updated GCEI and an adjustment for inflation from January 2004 to 2004-2005 dollars. Without those corrections, this amount equated to the Standard & Poor's permutation that resulted in $5.26 billion. Indeed, all figures calculated by Standard & Poor's and proffered before the referees were measured in Janu-

Notably, the Governor proposed additional annual New York City spending of $4.7 billion; the Regents proposed $4.7 billion from the State, plus $0.9 billion from the City, for a total of $5.6 billion; and New York City proposed $5.3 billion. Plainly, every governmental actor knew what the referees and the Appellate Division here concluded: A sound basic education will cost approximately $5 billion in additional annual expenditures. I remain hopeful that, despite the Court's ruling today, the policymakers will continue to strive to make the schools not merely adequate, but excellent, and to implement a statewide solution.

Judges ROSENBLATT, READ and SMITH concur with Judge PIGOTT; Judge ROSENBLATT concurs in a separate opinion; Chief Judge KAYE concurs in part and dissents in part in another opinion in which Judge CIPARICK concurs; Judge GRAFFEO taking no part.

Order modified, etc.

---

ary 2004 dollars. As defendants concede, the $1.93 billion endorsed by the majority must be adjusted for inflation.