Request of the Senate
No. 98-322

## OPINION OF THE JUSTICES
## (SCHOOL FINANCING)

June 23, 1998

*Philip T. McLaughlin*, attorney general, (*Mr. McLaughlin, Steven M. Houran*, deputy attorney general, *Martin P. Honigberg*, senior assistant attorney general, *Anne M. Edwards*, assistant attorney general, on the memorandum, and *Mr. McLaughlin* orally) in support of negative answers to the questions presented.

*Paul McEachern*, of Portsmouth, on the memorandum and orally, on behalf of Governor Jeanne Shaheen, in support of returning the

questions unanswered or returning negative answers to the questions presented.

*Joshua L. Gordon*, of Concord, on the memorandum and orally, on behalf of State Senators Caroline McCarley, Allen Whipple, Clesson Blaisdell, Debora Pignatelli, Sylvia Larsen, John King, Katie Wheeler, Beverly Hollingworth, and Burton Cohen, in support of returning the questions unanswered or returning negative answers to the questions presented.

*Peter Hoe Burling, Ann Torr, Merle Schotanus, Joseph Stone*, and *Richard Champagne*, State Representatives, on the memorandum, and *Mr. Burling* orally, in support of returning the questions unanswered or returning negative answers to the questions presented.

*John M. Lewis, Gail F. Paine, Joel C. Olbricht, Ann McArdle*, and *Jeffrey M. Pollock*, members of the State Board of Education, on the memorandum, and *Mr. Lewis* orally, in support of negative answers to the questions presented.

*Stanley R. Arnold*, commissioner, of Concord, on the memorandum and orally, on behalf of the New Hampshire Department of Revenue Administration, in support of negative answers to the questions presented.

*John E. Tobin, Jr.*, of Concord, on the memorandum and orally, *McLane, Graf, Raulerson and Middleton, P.A.*, of Manchester (*Wilbur A. Glahn, III* on the memorandum), and *Stein, Volinsky and Callaghan, P.A.*, of Concord (*Scott F. Johnson* and *Andru H. Volinsky* on the memorandum), on behalf of the Claremont petitioners (except Franklin School District), in support of affirmative answers to the questions presented.

*Kirkpatrick & Lockhart*, of Boston, Massachusetts (*John M. Edwards* on the memorandum and orally), on behalf of the New Hampshire House Republican Alliance *& a.*, in support of affirmative answers to the questions presented.

*Frederic K. Upton*, of Concord, on the memorandum and orally, in support of affirmative answers to questions 1 and 2.

*James M. Rubens*, State Senator, of Etna, on the memorandum and orally, and *Edward C. Mosca*, of Concord, on the memorandum, in support of affirmative answers to the questions presented.

*Sheehan Phinney Bass + Green*, of Manchester (*Thomas J. Flygare* on the memorandum), on behalf of Fredrick J. Bramante

(*Mr. Bramante* orally), in support of affirmative answers to questions 1 and 2.

The following resolution, Senate Resolution No. 4, requesting an opinion of the justices, was adopted by the senate on May 21, 1998, and filed with the supreme court on May 22, 1998:

"Whereas, there is presently before the Senate HB 1280-LOCAL, an act clarifying the procedures for background criminal checks for school employees and volunteers; and

"Whereas, there is also presently pending before the Senate, an amendment to HB 1280-LOCAL (document number 1998-1849s), which would amend HB 1280-LOCAL to: an act implementing the Advancing Better Classrooms program to provide a constitutionally adequate public education to all the children of New Hampshire; and

"Whereas, the bill as amended is designed to respond to the recent Claremont decision (Claremont School District v. Governor, 142 N.H. 462, 703 A.2d. 1353 (1997), hereinafter 'Claremont II'); and

"Whereas, the bill as amended contains provisions regarding the calculation of a state education tax, the calculation of a per pupil cost of an adequate education, and special abatements for certain communities; and

"Whereas, a question has been raised that the adoption of the bill as amended, including the abatement provisions, may be in violation of the language of Claremont II, and of Part I, Article 28-a and Part II, Article 5 of the state constitution; and

"Whereas, the majority opinion of the honorable court in the Claremont II decision called into question the constitutional validity of the entire local property tax system for the periods after 'the 1998 tax year' thereby creating an imminent risk of fiscal crisis for local school budgets throughout the state, which places a great premium on ensuring that any legislative solution adopted be consistent with the Claremont II decision prior to its implementation; and

"Whereas, HB 1280-LOCAL as amended reflects the efforts of the executive and legislative branches of our state government to address public education financing issues in response to the decision of the honorable court in Claremont II and therefore raises issues of constitutional dimension; and

"Whereas, HB 1280-LOCAL as amended would undertake substantial reevaluation of the traditional means of financing public education within New Hampshire, with great impacts on the traditional relationships among school districts throughout the

state, and between the state and local governments, all on the assumption that such substantial reevaluation would be consistent with the decision in Claremont II; now, therefore, be it

"Resolved by the Senate:

"That the justices of the supreme court be respectfully requested to give their opinion upon the following important questions of law:

1. Would enactment of HB 1280-LOCAL as amended, and its funding allocation formula and property tax abatement scheme violate Part II, Article 5 of the state constitution requiring that all taxes be proportional and reasonable?

2. Would enactment of HB 1280-LOCAL as amended, violate the express language of this court in Claremont II, that to the extent that the property tax is used to fund the provision of an adequate education, to be constitutional, the tax must be administered in a manner that is equal in valuation and uniform in rate throughout the state?

3. Would enactment of the multi-variant funding allocation formula using both local income and property wealth factors in section 86 of HB 1280-LOCAL as amended as it amends RSA 198:27-37 violate Part II, Article 5 of the state constitution relative to uniformity and proportionality or the express language of Claremont II?

4. Would enactment of the multi-variant funding allocation formula in section 86 of HB 1280-LOCAL as amended as it amends RSA 198:27-37, if coupled with the property tax abatement scheme in section 15 of HB 1280-LOCAL as amended, and resulting in continued disparity of effective property tax rates to support a constitutionally adequate education violate Part II, Article 5 of the state constitution or the express language of Claremont II?

5. Would enactment of HB 1280-LOCAL as amended, violate Part I, Article 28-a of the state constitution by requiring in section 59 of the bill as amended that every school district prepare and implement a local education improvement and assessment plan by requiring in sections 48 and 54 of the bill as amended that every school district provide approved schools subject to mandatory minimum approval standards set by the state board of education without providing every school district funding sufficient to pay for such mandates?

6. Would the enactment of any other provision of HB 1280-LOCAL as amended: (a) result in a violation of the 'proportional and reasonable' requirements of Part II, Article 5 of the New Hampshire constitution; or (b) create an impermissible classification of property in violation of Part II, Article 6 of the New Hampshire

constitution; or (c) violate any other provision of the New Hampshire constitution?

"That the senate clerk transmit copies of this resolution and HB 1280-LOCAL as amended (1998-1849s) to the justices of the supreme court."

The following response is respectfully returned:

*To the Honorable Senate*:

The undersigned justices of the supreme court submit the following reply to your questions of May 21, 1998. Following our receipt of your resolution, we invited interested parties to file memoranda with the court on or before June 2, 1998. Oral argument on the questions presented by the request took place at a special session of the court on June 5, 1998.

Before answering the specific questions raised in Senate Resolution No. 4, we address whether this request is appropriately the subject of an advisory opinion. Part II, Article 74 of the New Hampshire Constitution provides: "Each branch of the legislature as well as the governor and council shall have authority to require the opinions of the justices of the supreme court upon important questions of law and upon solemn occasions." There are several limitations in the operation of Part II, Article 74. We address the pertinent ones as follows.

■ First, "[a]dvisory opinions required by this constitutional provision are limited to advice upon important legal questions pending in, and awaiting consideration and action by, the body entitled to the advice in the course of its duty." *Opinion of the Justices*, 115 N.H. 329, 330, 340 A.2d 112, 114 (1975). There is no doubt that these requirements are met here. While it is suggested that an advisory opinion should not be allowed to proceed until the senate's consideration of the bill has reached the "penultimate stage" and is ready for an "ought to pass" vote, the constitution contains no such requirement. The only timing consideration imposed is that the justices are not ordinarily required to furnish opinions after the legislature has adjourned, except where requested for guidance at a possible special session of the legislature or at the next regular one. *Opinion of the Justices*, 105 N.H. 125, 127, 193 A.2d 880, 881 (1963).

Second, justices of the supreme court are not "empowered to give advisory opinions on legal questions involving resolution of questions of fact." *Opinion of the Justices*, 123 N.H. 510, 511, 463 A.2d 891, 892 (1983). The controlling questions before us, however,

involve a determination of the proposed legislation's facial constitutionality.

■ Third, the supreme court is not permitted to advise the legislature "as to the meaning and scope of existing statutes." *Opinion of the Justices*, 102 N.H. 187, 188, 152 A.2d 872, 873 (1959). To allow otherwise would place the court in the position of giving "advice in matters that may come before the court for decision," *Opinion of the Justices*, 67 N.H. 600, 601, 43 A. 1074, 1074 (1892), or expressing its views "upon questions involving private rights." *Opinion of the Justices*, 76 N.H. 597, 600, 79 A. 490, 492 (1911). Our response to this request for an opinion of the justices does not require us to advise upon a presently effective statute. Thus, there is no conflict between rendering a non-binding advisory opinion for the senate while retaining jurisdiction in *Claremont School District v. Governor*, 142 N.H. 462, 476, 703 A.2d 1353, 1360 (1997) (*Claremont II*).

■ We conclude that Senate Resolution No. 4 presents important questions of law and a solemn occasion for which we are required to render an advisory opinion. "In giving such an opinion, the justices do not act as a court, but as the constitutional advisers of either branch of the legislature requiring their opinion . . . ." *Opinion*, 60 N.H. 585, 585 (1881).

■ Your first question asks, "Would enactment of HB 1280-LOCAL as amended, and its funding allocation formula and property tax abatement scheme violate Part II, Article 5 of the state constitution requiring that all taxes be proportional and reasonable?" Your second question asks whether enactment of HB 1280-LOCAL as amended (the bill) would "violate the express language of this court in Claremont II, that to the extent that the property tax is used to fund the provision of an adequate education, to be constitutional, the tax must be administered in a manner that is equal in valuation and uniform in rate throughout the state?" Because *Claremont II* simply explained the meaning and import of Part II, Article 5, we answer these two questions together. Both are answered in the affirmative. In reaching this conclusion, we do not revisit the merits of the issues raised in *Claremont II*. Rather, we advise on the constitutionality of the proposed legislation under the law of this State as expressed therein.

Part II, Article 5 of the State Constitution provides that the legislature may "impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and

residents within, the said state." In *Claremont II*, the court concluded that taxes levied to fund education "are in fact State taxes that have been authorized by the legislature to fulfill the requirements of the New Hampshire Constitution," and are not, in fact, local taxes. *Claremont II*, 142 N.H. at 469, 703 A.2d at 1356. Accordingly, the court held that "the varying property tax rates across the State violate part II, article 5 of the State Constitution in that such taxes, which support the public purpose of education, are unreasonable and disproportionate." *Id.* at 471, 703 A.2d at 1357. The court offered further that "[t]o the extent that the property tax is used in the future to fund the provision of an adequate education, the tax must be administered in a manner that is equal in valuation and uniform in rate throughout the State." *Id.*

The bill, in addition to defining an adequate education, purports to establish a uniform State education tax rate based upon the equalized value of all taxable real property in the State. The tax rate is determined by calculating the total statewide cost for educating all New Hampshire students and dividing this sum by the total statewide equalized property value. The bill also authorizes, however, a "special abatement" for "[t]he amount of state education tax apportioned to each town . . . in excess of the product of the statewide per pupil cost of an adequate education . . . times the average daily membership in residence for the town." HB 1280-LOCAL ¶ 15 (1998) (amended by senate). By the terms of the bill, the commissioner of revenue administration is directed to calculate each town's tax by multiplying the State education tax rate by the total equalized value of property within it, *less* any special abatement. *See* HB 1280-LOCAL ¶ 12 (1998) (amended by senate). Thus, the special abatement applies before any taxpayer within a given town receives a tax bill. We note that even if the bill provided for the actual collection of revenue raised through the uniform State education tax, and thereafter reimbursed certain qualifying taxpayers pursuant to the special abatement, our conclusions herein would remain unchanged.

As a result of the special abatement, the effective tax rate is reduced below the uniform State education tax rate in any town that can raise more revenue than it needs to provide the legislatively defined "adequate education" for its children. For example, in those towns where there are no children, the special abatement reduces the effective tax rate to zero. Meanwhile, in any town where the property value is insufficient to support the revenue required to educate local children adequately at the uniform State education tax rate, the effective tax rate remains equal to the uniform State

education tax rate. Those towns receive a grant from the State to meet the otherwise unfunded costs of an adequate education. Although such towns would be fully funded, the owners of property therein would pay taxes at a higher rate than those in towns with a surplus of revenue, which would receive the special abatement.

■ Tax abatements and exemptions are not explicitly recognized in the New Hampshire Constitution. The court has, nevertheless, held that "[i]n the selective process of classifying certain property for taxation and exempting other property the Legislature has a wide discretion." *Felder v. Portsmouth*, 114 N.H. 573, 577, 324 A.2d 708, 710 (1974) (quotation omitted). Abatements and exemptions necessarily result in a disproportionate tax burden on the remaining property in the taxing district. *See Opinion of the Justices*, 105 N.H. 22, 23, 192 A.2d 22, 23 (1963). Therefore, to satisfy Part II, Article 5, abatements must be supported by good cause and exemptions by just reasons, *see Opinion of the Justices*, 117 N.H. 512, 515, 520-21, 374 A.2d 964, 965-66, 968 (1977), and thereby "reasonably promote some proper object of public welfare or interest." *Felder*, 114 N.H. at 577, 324 A.2d at 710 (quotation omitted); *see Opinion of the Justices*, 117 N.H. at 520-21, 374 A.2d at 969 (noting that phrase "for good cause shown" allows abatement if justice required, as consistent with constitution); *Opinion of the Justices*, 105 N.H. at 23, 192 A.2d at 23 (exemptions must be based on just reasons).

■ When determining whether good cause for an abatement or just reasons for an exemption exist, we leave matters of public policy to the legislature and do not "concern ourselves with the wisdom and practicality of proposed legislation." *Opinion of the Justices*, 131 N.H. 640, 642, 557 A.2d 273, 275 (1989); *see, e.g., Opinion of the Justices*, 115 N.H. 228, 231, 338 A.2d 553, 555-56 (1975) (incremental increase in elderly exemption supported by assumption that average earning capacity decreases with age); *Briggs' Petition*, 29 N.H. 547, 552 (1854) (recognizing inability to pay or other misfortune as "good cause" is consistent with policy of protecting towns from a contingent claim for taxpayer's support). The court's duty is to safeguard constitutional mandates, *see Opinion of the Justices*, 131 N.H. at 642, 557 A.2d at 275, by interpreting the plain and common meaning of the constitution in light of the framers' purpose and intent, *see N.H. Munic. Trust Workers' Comp. Fund v. Flynn, Comm'r*, 133 N.H. 17, 21, 573 A.2d 439, 441 (1990).

■ We are not persuaded that the special abatement provision is supported by good cause or just reasons consistent with the

constitution. Proponents of the bill would have us construe Part II, Article 5 as permitting the special abatement in order to prevent social discord and because other tax resolutions could be divisive. That all three branches of government must struggle with difficult decisions which may cause social unrest cannot be a factor in the court's constitutional review of the bill. *See University of California Regents v. Bakke*, 438 U.S. 265, 299 (1978) (court's role is to lift constitutional principles above pragmatic political judgments of particular time and place). The duty of those of us who are constitutional officers, no matter in what branch of government, is to resolve important issues of the day within the confines of the constitution for the benefit of the people of New Hampshire.

 Proponents of the bill also assert that the special abatement is designed to protect towns from financially contributing to the adequate education of children in other towns or school districts. Essentially, the proponents seek to measure proportionality and fairness on a municipality-by-municipality or district-by-district basis, rather than statewide. But, to the extent that a property tax is used to raise revenue to satisfy the State's obligation to provide an adequate education, it must be proportional across the State. *See Claremont II*, 142 N.H. at 470, 703 A.2d at 1357. While good cause or just reasons can be created by public policy determined by the legislature, public policy cannot undermine the constitutional requirement of proportionality. That is, the purpose of an abatement or an exemption can never be to achieve disproportionality for disproportionality's sake.

> Because the diffusion of knowledge and learning is regarded by the State Constitution as "essential to the preservation of a free government," N.H. CONST. pt. II, art. 83, it is only just that those who enjoy such government should equally assist in contributing to its preservation. The residents of one municipality should not be compelled to bear greater burdens than are borne by others.

*Id.; see also Claremont School Dist. v. Governor*, 138 N.H. 183, 192, 635 A.2d 1375, 1381 (1993) (*Claremont I*) ("free government is dependent for its survival on citizens who are able to participate intelligently in the political, economic, and social functions of our system"). This obligation cannot be avoided or lessened by the mere circumstance of a town having few children or a town having a wealth of property value, including wealth generated by the presence of heavy industry. *Cf. Barksdale v. Town of Epsom*, 136 N.H.

511, 514, 618 A.2d 814, 816 (1992) ("[a] citizen cannot claim tax aggrievement merely because he or she does not personally add to the public education expense"); *Union Transit Co. v. Kentucky*, 199 U.S. 194, 203 (1905) (taxpayers cannot refuse to pay simply because they do not receive equal share of benefits; childless citizens must pay share of school tax).

It should not be forgotten that New Hampshire is not a random collection of isolated cities and towns. Indeed, all of us live in a single State. The benefits of adequately educated children are shared statewide and are not limited to a particular town or district. We live in a highly mobile society such that a child may be educated in Pittsfield and, as an adult, reside in Moultonborough. That adult may serve or influence the town or State as an elected or appointed official, a business or civic leader, or in various other endeavors. The benefits of that citizen's public education and contributions to community may be felt far beyond the boundaries of the educating town or district. Therefore, it is basic to our collective well-being that all citizens of the State share in the common burden of educating our children.

In conclusion, while the bill proposes a tax based on an equalized valuation and initially assigns a uniform rate, clearly some taxpayers would pay a far higher tax rate in furtherance of the State's obligation to fund education than others, due to the special abatement. Application of the special abatement guarantees that property owners paying the full rate bear an increased tax burden compared with property owners who are not assessed the full rate. *Cf. Opinion of the Justices*, 99 N.H. 525, 527, 113 A.2d 547, 548 (1955) (even though uniform rate applied, taxes produced are unequal and disproportional because effect is to tax one taxpayer upon one percentage of income while taxing another upon a different percentage). Because such disproportionality is not supported by good cause or a just reason, it violates both the plain wording of Part II, Article 5 and the express language of *Claremont II*.

■ Questions three and four of Senate Resolution No. 4 request review of section eighty-six of the bill, and question five seeks review of sections forty-eight, fifty-four, and fifty-nine. Because the bill provides that nearly the entire proposed legislation is rendered invalid if the abatement provision does not stand, including the sections identified in questions three through five, our opinion renders unnecessary answering these questions. *See* HB 1280-LOCAL ¶ 82 (1998) (amended by senate). We respectfully decline to answer question six because of its generality. *See Opinion of the*

*Justices (Weirs Beach)*, 134 N.H. 711, 717, 598 A.2d 864, 867-68 (1991).

In interpreting the constitution as we do today, we are mindful that those who crafted the words of Part II, Article 5 had lived under the taxation policies of the British Crown. The framers were thus cognizant of schemes of taxation which were oppressive, unpredictable, and grossly unfair. It undoubtedly was the specter of unfair taxation that prompted the requirement that taxes be both proportional and reasonable. Our interpretation of this language has been consistent and to advise otherwise now would be the first step down a dangerous path leading to frustration of the document upon which our government rests. The language of our constitution commands that taxes be no less than fair, proportional, and reasonable.

On December 17, 1997, when *Claremont II* was issued, the court was conscious of the magnitude of the tasks and challenges it had passed to its co-equal branches of government. Part I, Article 37 of the constitution, which in this case bears on our interpretation of Part II, Article 5, instructs that the legislative, executive, and judicial powers of our State should be kept "as separate from and independent of, each other, as the nature of a free government will admit." The framers' language continues by describing "that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity." It is in such spirit of union and amity that we retained jurisdiction in *Claremont II*.

Our task in the first instance is to interpret the constitution. We have done so in *Claremont I* and *Claremont II*. We repeat what we said in *Claremont II*, that "we were not appointed to establish educational policy, nor to determine the proper way to finance its implementation. That is why we leave such matters, consistent with the Constitution, to the two co-equal branches of government." *Claremont II*, 142 N.H. at 475, 703 A.2d at 1360. It is neither our task nor intent to manage the public school systems of the State, or to suggest that the State education system cannot incorporate local elements. In this context, we note the commendable steps taken by the Governor and legislature in reaching their definition of a constitutionally adequate education. The legislature's involvement of a broad cross-section of the community in the process can only lead to a definition that will serve this State's school-age citizens well as they journey toward achievement in the world around them. We applaud the Governor and legislature for the work accomplished to date and in advance for that yet to be undertaken.

DAVID A. BROCK

WILLIAM R. JOHNSON

W. STEPHEN THAYER, III

SHERMAN D. HORTON, JR.

JOHN T. BRODERICK, JR.

June 23, 1998

In addition to those to whom we granted oral argument, who are listed at the beginning of this opinion, we received written comments from the following legislators, attorneys, and citizens. The court extends its appreciation to all who provided comment.

Business & Industry Association of New Hampshire (Katharine Eneguess, vice president); Chapman Appraisal Company (Fran Chapman); City of Nashua (Donald C. Davidson, mayor); Corcoran Consulting Associates, Inc. (Wil Corcoran); Donahue, Tucker & Ciandella (Robert D. Ciandella, Esq. and Susan W. Chamberlin, Esq.) on behalf of the Town of Seabrook; NEA-New Hampshire (James F. Allmendinger, Esq.); Needham Associates, Inc. (Paul G. Needham); New Hampshire Association of School Principals (Peggy McAllister, executive director); New Hampshire School Administrators Association (Dr. Mark V. Joyce, executive director); New Hampshire School Boards Association (Dr. Paul Krohne, executive director); Northern New England Council of American Federation of Teachers (Judy Lavoie, legislative agent); Soule, Leslie, Kidder, Sayward & Loughman (Gordon B. Graham, Esq.), on behalf of the Derry School Board and the Derry Cooperative School District; Ralph L. Akins, State Representative; John R. M. Alger, State Representative; Gordon Allen, State Representative; Clifton Below, State Representative; Ken Blevens; Sarah Bonneau, State Representative; Ralph Brewster; Robert P. Burke; Linda Camarota; Brian Christeson; Thomas J. Christie; Debbie Clough; Mike de Martelly; Dianne Kaplan deVries; Robert Dezmelyk; Sandra K. Dowd, State Representative; Patricia A. Dowling, State Representative; Robert M. Fesh, State Representative; Martin Feuerstein, State Representative; Robert E. Foster; Suzan L. R. Franks, State Representative; Marilyn A. Fraser, State Representative; Barbara C. French, State Representative; Dr. Robert L. Fried; M. Katharine Fuller; Paul A. Gibbons, State Representative; Barbara Gitlin; John P. Gleason, State Representative; Richard H. Goodman; Michelle R. Groleau; Paul E. Groleau; Joseph S. Haas, Jr.; Elizabeth Hager, State Representative; Nick Hart, State Representative; William G. Hasbrouck; Roland E. Hemon, State Representative; Francis M.

Henry; Doris Hohensee; Alf E. Jacobson, State Representative; George N. Katsakiores, State Representative; Phyllis M. Katsakiores, State Representative; Jane Kelley, State Representative; Ellen Galarneau Kolb; John S. Langone, State Representative; John D. Lenaerts; Robert Letourneau, State Representative; Jay Lucas; Harold V. Lynde, State Representative; Margaret E. Lynott, State Representative; William C. Mackenzie; A. Richard Marple; Tom McCormick; Paul A. McGuirk, State Representative; Paul M. Mirski, State Representative; Bob Mulvaney; Donna Ohanian; Derek Owen, State Representative; Arthur Pelletier, State Representative; Andrew R. Peterson, State Representative; Thomas B. Place; John M. Pratt, State Representative; Barbara Hull Richardson, State Representative; Timothy N. Robertson, State Representative; Kathleen Rogers, State Representative; Michael Rollo, State Representative; Suzanne Ryan; Frank V. Sapareto, State Representative; Bill Sartori; Gilman C. Shattuck; Mark A. Stull, Esq.; Kathleen N. Taylor, State Representative; C. Robertson Trowbridge; Dennis P. Vachon, State Representative; Mary Vahey; Steve Vaillancourt, State Representative; Eugene M. Van Loan, III, Esq.; John Vogl, State Representative; Jean Wallin, State Representative; William Williams, State Representative; Colette M. Worsman.