[973 NE2d 752, 950 NYS2d 342]

AYUBE HUSSEIN, as Parent of a Student in the Albany City School District, et al., Respondents, v STATE OF NEW YORK, Appellant.

Argued April 26, 2012; decided June 26, 2012

APPEARANCES OF COUNSEL

*Eric T. Schneiderman, Attorney General,* Albany (*Denise A. Hartman, Barbara D. Underwood* and *Andrew D. Bing* of counsel), for appellant.

*Divine, Markovits & Snyder, L.L.P.,* Albany (*Terence J. Devine* of counsel), and *The Biggerstaff Law Firm, L.L.P.,* Slingerlands (*Robert E. Biggerstaff* and *Laura K. Biggerstaff* of counsel), for respondents.

*Richard E. Casagrande,* Latham, and *Elizabeth R. Schuster* for New York State United Teachers, amicus curiae.

## OPINION OF THE COURT

MEMORANDUM.

The order of the Appellate Division should be affirmed with costs and the certified question should be answered in the negative.

Plaintiffs' claims are neither moot nor unripe for review. The merits of the controversy are not before us.

CIPARICK, J. (concurring). I fully agree with the majority's holding that plaintiffs' claims are neither moot nor unripe. I

write separately to emphasize that *Campaign for Fiscal Equity v State of New York* (86 NY2d 307 [1995] [*CFE I*]) is, and should remain, good law and that the parameters we set forth in that case and in *CFE II* (*Campaign for Fiscal Equity v State of New York*, 100 NY2d 893 [2003]) to define the content of a constitutionally-required "sound basic education" do not intrude into the policy-making functions of the other branches of government but rather constitute a proper exercise of our interpretative function.

"With full recognition and respect . . . for the distribution of powers in educational matters among the legislative, executive and judicial branches," we have observed that "it is nevertheless the responsibility of the courts to adjudicate contentions that actions taken by the Legislature and the executive fail to conform to the mandates of the Constitutions which constrain the activities of all three branches" (*Board of Educ., Levittown Union Free School Dist. v Nyquist*, 57 NY2d 27, 39 [1982] [*Levittown*]). Indeed, though "[w]e have neither the authority, nor the ability, nor the will, to micromanage education financing . . . it is the province of the Judicial branch to define, and safeguard, rights provided by the New York State Constitution, and order redress for violation of them" (*CFE II*, 100 NY2d at 925; *see also Matter of Maron v Silver*, 14 NY3d 230, 263 [2010] ["whether the Legislature has met its constitutional obligations . . . is within the province of this Court"]).

Article XI, § 1 of the State Constitution, the Education Article, provides: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." In *Levittown*, we held that the Education Article imposed a duty on the Legislature to provide all children in New York the opportunity of an "education," a term that we interpreted "to connote a sound basic education" (57 NY2d at 48). We observed that "[w]hat appears to have been contemplated when the [E]ducation [A]rticle was adopted at the 1894 Constitutional Convention was a State-wide system assuring minimal acceptable facilities and services" (*id.* at 47).

In *CFE I*, noting "*Levittown*'s unambiguous acknowledgment of a constitutional floor with respect to educational adequacy" (86 NY2d at 315), we set out to further define "a sound basic education" in order that we may meaningfully measure the State's efforts to meet its constitutional obligations. We determined that

"[s]uch an education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury. If the physical facilities and pedagogical services and resources made available under the present system are adequate to provide children with *the opportunity to obtain these essential skills,* the State will have satisfied its constitutional obligation" (*id.* at 316).

We set forth certain essentials, finding that

"[c]hildren are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas" (*id.* at 317).

In Judge Simons' dissent in *CFE I*, he argued that "[i]t is for other branches of government, not the courts, to define what constitutes a sound basic education and, assuming the State has not defaulted on its duty to establish a State-wide system and provide financial support, to ensure that the opportunity to be educated is available to all" (*id.* at 333). Judge Simons expressed the view that the courts' ability to assess the constitutionality of an education financing scheme should be curtailed once "the State has established a structure for the school system and provided adequate funding for it *as measured by the State's resources*" (*id.* at 342 [emphasis added]).

In *CFE II*, we rejected the State's argument that a sound basic education was achieved by the eighth or ninth grade (100 NY2d at 906) and held that children are entitled to "the opportunity for meaningful high school education, one which prepares them to function productively as civic participants" (*id.* at 908). We directed the State to determine the actual cost of a sound basic education and to ensure that schools receive the resources necessary to provide it (*see id.* at 930). Judge Read argued in dissent that we had created a constitutional standard that was "illusory," lacking "any way to measure whether it has been (or may be) met" (*id.* at 948, 952).

In his concurrence, Judge Smith embraces the views of Judge Simons and Judge Read in their respective dissents and questions the continued viability of *CFE I* (*see* concurring op at 908), the alternative to that case's rule being, ostensibly, that the Legislature and Executive will assume the task of defining a "sound basic education" as it relates to the Education Article and fund it at a level they deem reasonable within budget limits (*see CFE I*, 86 NY2d at 342 [Simons, J., dissenting]). Judge Read's dissent here echoes similar sentiments, but goes further to say that because "gross and glaring inadequacy . . . cannot be said to exist in New York['s education system]" given the State's high per pupil expenditures, the constitutional threshold for this Court's review of the other branches' education financing decisions has not been met (*see* dissenting op at 909 [internal quotation marks omitted]). Contrary to my colleagues in concurrence and dissent, I see no reason to depart from our decision in *CFE I* and, since claims such as plaintiffs' implicate the Education Article's protected rights, I am compelled to express my concerns about the potential consequences of disturbing that precedent.

If we declare that a sound basic education consists only of what the Legislature and Executive dictate, the scope of the State's constitutional duty under the Education Article and, conversely, the scope of the constitutional rights of our schoolchildren, is limited to what those branches say it is. Abandoning *CFE I*[1] would not only entrust the Legislature and Executive with the decidedly judicial task of interpreting the meaning of the Education Article but cast them in the role of being their own constitutional watchdogs. Though, under *Levittown*, we could continue to review claims of "gross and glaring inadequacy" (57 NY2d at 48), our inquiry would be superficial as the adequacy of the Legislature's and Executive's efforts would, in the first instance, be defined by those branches. Our system of separation of powers does not contemplate or permit such self-policing, nor does it allow us to abdicate our function as "the ultimate arbiters of our State constitution" (*Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14, 28 [2006]; *see also Cohen v State of New York*, 94 NY2d 1, 11 [1999]) simply because public funds are at stake. In short, parsing out what

---

1. Although the dissent "would accept the Attorney General's invitation [to] dismiss the complaint" without necessarily overruling the *CFE* line of cases (dissenting op at 911), declaring plaintiffs' claims nonjusticiable would effectively render *CFE I* and *CFE II* of, at best, dubious precedential value.

the Education Article actually requires, as we did in *CFE I* and *CFE II*, not only enables the Legislature and Executive to fulfill their constitutional mandate but ensures that we in the Judiciary do the same.

Thus far, *CFE I* has not created the kind of thicket of litigation the New Jersey courts have encountered in the decades the State's education financing scheme was declared unconstitutional (*see Robinson v Cahill*, 118 NJ Super 223, 287 A2d 187 [Law Div 1972], *mod* 62 NJ 473, 303 A2d 273 [1973]; *Education Law Ctr. ex rel. Abbott v Burke School Children v New Jersey Dept. of Educ.*, 2012 WL 1080867, 2012 NJ Super Unpub LEXIS 732 [App Div Apr. 3, 2012]). That it will has been the concern of the critics of *CFE I* and *CFE II* (*see CFE II*, 100 NY2d at 958 [Read, J., dissenting] ["(t)his dispute . . . is destined to last for decades, and . . . is virtually guaranteed to spawn similar lawsuits throughout the state"]; *Hussein v State of New York*, 81 AD3d 132, 134 [3d Dept 2011] [opining that, as a result of *CFE I*, there could be "civil actions commenced on behalf of students in every school district across the state"]). Even if a bevy of protracted claims arise, however, *CFE I* should not be compromised. Prudential concerns about judicial economy are both valid and necessary; however, they are no reason to close the courthouse doors to parents and children with viable constitutional claims. That the State may be violating its constitutional mandate on a grander scale, in many more localities and toward many more children, than originally anticipated does not drown out, by force of volume, the existence of the violation. As my colleague stated in dissent in *Bordeleau v State of New York* (18 NY3d 305 [2011]), "[u]nconstitutional acts do not become constitutional by virtue of repetition[ ] [or] custom" (*id.* at 318 [Pigott, J., dissenting]). Neither do valid legal claims become less actionable by virtue of the fact that they are shared by many. The potential breadth of the problem is cause for greater, not lesser, vigilance.

Moreover, the experience of New Hampshire provides its own cautionary tale of the consequences of leaving to the Legislature and Executive the task of defining a constitutionally adequate education, as *CFE I*'s critics would have us do. In 1993, the Supreme Court of New Hampshire held that the state's constitution "imposes a duty on the State to provide a constitutionally adequate education to every educable child," but declared that it was for the Legislature and the Executive to "define the parameters of the education mandated by the constitution" (*see*

*Claremont School Dist. v Governor*, 138 NH 183, 184, 192, 635 A2d 1375, 1376, 1381 [1993]). By 1997, when neither branch had done so, the court again made clear that the State was duty bound to, among other things, define the content of a constitutionally adequate education, fund it and create a system of accountability to ensure its delivery (*see Claremont School Dist. v Governor*, 142 NH 462, 477, 703 A2d 1353, 1360-1361 [1997]). Again, the court noted that it was "not appointed to establish educational policy, nor to determine the proper way to finance its implementation" (142 NH at 475, 703 A2d at 1360).[2] In 1998, the State sought a two-year extension to fulfill its constitutional mandate, which the court denied (*see Claremont School Dist. v Governor*, 143 NH 154, 157, 725 A2d 648, 650 [1998]). A year later, with still no definition in place but with legislation pending, the court denied as premature the plaintiffs' request to assign a special master to define a constitutionally adequate education and to determine its cost, noting "once more . . . that it is neither [the court's] task nor intent to manage the public school systems of the State" (*Claremont School Dist. v Governor*, 144 NH 210, 212, 744 A2d 1107, 1108-1109 [1999] [internal quotation marks and citation omitted]). By 2002, after accountability and financing legislation failed, the court held that "the State's duty to provide a constitutionally adequate education includes accountability," which "means that the State must provide a definition of a constitutionally adequate education, the definition must have standards, and the standards must be subject to meaningful application" (*Claremont School Dist. v Governor*, 147 NH 499, 508-509, 794 A2d 744, 751 [2002]). Between 2002 and 2008 "the only action taken by the legislature to fulfill its acknowledged obligation . . . was the establishment . . . of a joint legislative oversight committee on accountability" (*Londonderry School Dist. SAU #12 v State*, 157 NH 734, 739, 958 A2d 930, 934 [2008, Broderick, Ch. J., dissenting] [internal quotation marks omitted]).[3]

What we have learned from New Hampshire's education financing litigation is that had we adopted the dissenting

---

**2.** The court did cite seven criteria as "general, aspirational guidelines for defining educational adequacy" (142 NH at 474, 703 A2d at 1359).

**3.** In addition to the five *Claremont* cases already mentioned, the Supreme Court of New Hampshire issued three advisory opinions at the request of the Legislature regarding the constitutionality of various aspects of the State's education financing efforts (*see Opinion of the Justices [Reformed Pub. School Fin. Sys.]*, 145 NH 474, 765 A2d 673 [2000]; *Opinion of the Justices [Tax Plan Referendum]*, 143 NH 429, 725 A2d 1082 [1999]; *Opinion of the Justices [School Fin.]*, 142 NH 892, 712 A2d 1080 [1998]).

Judge's proposed rule in *CFE I* we would not necessarily have avoided litigation and, in fact, may have produced more. Though one can only speculate, it is quite possible that had we elected not to provide qualitative standards by which to understand what is meant by a "sound basic education," we may have found it necessary to do so now, 17 years after *CFE I*. In *Londonderry*, former Chief Justice Broderick, dissenting from the majority's decision to dismiss the most recent education financing claims as moot,[4] recounted the history of the *Claremont* cases and observed that the Supreme Court of New Hampshire, "for the past fifteen years, ha[d] repeatedly, respectfully and appropriately deferred to the political branches to resolve the critical issues the numerous school funding decisions have identified" (157 NH at 740, 958 A2d at 935), but to no avail. Noting that the State had still not met its obligation, the Chief Justice aptly concluded that "[d]eference . . . has its limits. Constitutional rights must be enforced or they cease to be rights" (*id.*).

Indeed, there *is* "a point at which the education available is so palpably inadequate that the courts must intervene, determine the extent of the inadequacy and order the problem to be solved at State expense" (*CFE I*, 86 NY2d at 342 [Simons, J., dissenting]). Without such outer bounds, it is the Education Article's mandate of a State-provided free public education that becomes "illusory" (*CFE II*, 100 NY2d at 948 [Read, J., dissenting]), not the template provided in *CFE I* and *CFE II* to flesh out the nature of that obligation. To be sure, "[i]t is the responsibility of the State to offer the opportunity of a sound basic education, and it is the responsibility of this Court to determine whether the State is fulfilling its responsibility to the plaintiffs" (*CFE II*, 100 NY2d at 940 [Smith, G.B., J., concurring]). Thus, while plaintiffs face the "formidable burden of proof imposed on one who attacks the budget plan" (*CFE III*, 8 NY3d 14, 29 [2006] [internal quotation marks omitted]), and the trial court may very well determine that the State has met its

---

4. The majority in *Londonderry* dismissed the petitioners' declaratory judgment action challenging the constitutionality of the statute previously governing education funding, because intervening legislation had superseded the challenged bill; therefore, the contested bill was no longer in effect (*see* 157 NH at 736, 958 A2d at 932). As the substitute legislation had neither been "challenged by the petitioners or subjected to a factual inquiry before the trial court," the case was dismissed as moot (*id.*). Here, by contrast, chapter 57 of the Laws of 2007, the legislation that the State claims renders plaintiffs' action moot, is precisely the legislation that plaintiffs' second amended complaint alleges was insufficient to provide a sound basic education to the children in plaintiffs' districts.

constitutional obligations through the enactment of the 2007 Foundation Aid reforms, the Court today reaches the correct result in allowing plaintiffs' claims to move forward.

SMITH, J. (concurring). I concur on constraint of *Campaign for Fiscal Equity v State of New York* (86 NY2d 307 [1995] [*CFE I*]).

This case, like *CFE I*, is based on allegations that the State is not adequately funding certain of its public schools, and thus is violating the Education Clause of the State Constitution (art XI, § 1: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated"). The Appellate Division, while believing itself bound to uphold the complaint, expressed its doubt that such cases should be in the courts. The Appellate Division said:

> "Though we are loathe to enmesh the courts in a subject that primarily involves state fiscal policy and social policy concerns, rather than strictly legal issues, the Court of Appeals decision in *Campaign for Fiscal Equity v State of New York* (86 NY2d 307 [1995]) compels us to affirm. Courts must act with restraint and should avoid interfering with matters that generally fall within the province of the Executive and Legislature, so as to preserve the separation of powers. The Court of Appeals has expressed those concerns, yet determined that it would allow students and parents to sue defendant over school funding—a subject that not only has legal implications, but intimately intertwines them with budgetary issues and public policy choices (*see Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d at 28; *Campaign for Fiscal Equity v State of New York*, 100 NY2d at 925; *see also Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d at 34-35 [Kaye, Ch. J., concurring in part and dissenting in part]). Judge Rosenblatt's concurrence in the latest *CFE* decision noted that those cases dealt only with school funding in the City of New York, and that a statewide approach to this problem is best left to the Executive and Legislature (*see Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d at 33 [Rosenblatt, J., concurring]). While we wholeheartedly agree, and believe that those branches of

government should be dealing with this issue without undue interference—potentially rising to the level of civil actions commenced on behalf of students in every school district across the state—we are constrained to hold that the present action must be permitted to proceed according to the course charted by the Court of Appeals." (*Hussein v State of New York*, 81 AD3d 132, 134 [3d Dept 2011].)

Judge Simons expressed similar views 17 years ago in his *CFE I* dissent:

"It is for other branches of government, not the courts, to define what constitutes a sound basic education and, assuming the State has not defaulted on its duty to establish a State-wide system and provide financial support, to ensure that the opportunity to be educated is available to all." (86 NY2d at 333.)

I agree with the Appellate Division here, with Judge Simons, and with Judge Read's dissent in *Campaign for Fiscal Equity v State of New York* (100 NY2d 893, 950 [2003] [*CFE II*]), where she pointed out "[t]he risks inherent in" *CFE I*'s "novel approach to constitutional adjudication." But *CFE I* decided that lawsuits like this one can be brought.

If *CFE I* is accepted as good law, the State's arguments for dismissing this complaint cannot succeed. Indeed, those arguments seem to me very weak. The State's brief contains two points, the first saying that in light of recent legislation relating to school funding it would be "imprudent" for the courts to entertain the case, and the second saying the case is barred by "traditional principles of mootness and ripeness." I know of no warrant for rejecting a claim to vindicate a recognized constitutional right on the ground of imprudence. And the case is obviously neither moot nor unripe. A moot case is one in which nothing turns on the result—but if plaintiffs prevail here, large sums of taxpayer money would be directed to the public schools of their districts. And if plaintiffs, the parents of children in those public schools, are constitutionally entitled to have this money spent on their children's educations, they are entitled to it now. They would be rightly dismayed to learn that their claims will not ripen for several years, until after their children have graduated.

I can only understand the State's arguments here as implicitly inviting us to abandon *CFE I*. Despite the views I have

expressed, I do not believe we should now accept the invitation. The worst fears of Judges Simons and Read, as expressed in their *CFE I* and *CFE II* dissents, have not yet come true, and perhaps never will. In *CFE III (Campaign for Fiscal Equity, Inc. v State of New York,* 8 NY3d 14 [2006]), we adhered to *CFE I* and *CFE II,* but made clear that in applying those precedents we will show great deference to executive and legislative choices as to how much money to put into public schools, and how to allocate that money. A similar trend has appeared in some other states in which school funding issues have been constitutionalized: those states have not repudiated their earlier decisions, but have interpreted them to leave broad scope for choices made by the executive and legislative branches *(see Hancock v Commissioner of Educ.,* 443 Mass 428, 822 NE2d 1134 [2005]; *Montoy v State,* 282 Kan 9, 138 P3d 755 [2006]; *Londonderry School Dist. SAU #12 v State,* 157 NH 734, 958 A2d 930 [2008]).

Thus it is not clear to me that we cannot live with the *CFE I* decision. I must add that it is also not clear to me that we can. I take heart, however, from the fact that we have so far not set out upon a road like that traveled by New Jersey, where school funding litigation is now in its fifth decade *(see Robinson v Cahill,* 118 NJ Super 223, 287 A2d 187 [Law Div 1972], *mod* 62 NJ 473, 303 A2d 273 [1973]; *Education Law Ctr. ex rel. Abbott v Burke School Children v New Jersey Dept. of Educ.,* 2012 WL 1080867, 2012 NJ Super Unpub LEXIS 732 [App Div Apr. 3, 2012]).

READ, J. (dissenting). Granted, this appeal may not be conventionally moot or unripe. But then, plaintiffs' claims are not justiciable in the orthodox sense either *(see Board of Educ., Levittown Union Free School Dist. v Nyquist,* 57 NY2d 27, 48 [1982] [indicating the constitutional standard would be unmet only in the case "possibly, of gross and glaring inadequacy," which cannot be said to exist in New York where "the average per pupil expenditure exceeds that in all other States but two"];[1] *Campaign for Fiscal Equity v State of New York,* 86 NY2d 307,

---

1. New York has maintained its high-ranking position. According to the National Education Association, the U.S. average per student expenditure for public elementary and secondary schools in 2009-2010 fall enrollment was $10,586. Among the states, New York ranked second in per pupil expenditures ($16,922), barely behind New Jersey ($16,967) (National Education Association, Rankings and Estimates: Rankings of the States 2010 and Estimates of School Statistics 2011 [Dec. 2010], at x, available at http://www.nea.org/assets/docs/HE/NEA_Rankings_and_Estimates010711.pdf [accessed June 19, 2012]). Total expenditures for public elementary and secondary schools in New York

*(n. cont'd)*

341-342 [1995, Simons, J., dissenting] [interpreting *Levittown* to hold that "(t)he courts . . . were not to interfere in constitutional responsibilities assigned to other branches of government unless the executive and legislative branches had, in effect, defaulted on their duty to establish a State-wide system of education and fund it"] [*CFE I*]). This is why adequacy litigation is so difficult to deal with once the judiciary slips the traces of justiciability and lets these lawsuits go forward—as we did in *CFE I* and *Campaign for Fiscal Equity v State of New York* (100 NY2d 893 [2003] [*CFE II*])—despite the serious separation-of-powers issues they pose.[2]

The adequacy litigation in New York differed from that in most states, as the *CFE* plaintiffs challenged only the level of state funding of the New York City School District, not the adequacy of education funding on a statewide basis. Nonetheless, the Governor proposed and the Legislature adopted a statewide plan—chapter 57 of the Laws of 2007—in response to the *CFE* litigation and, in particular, our decision in *Campaign for Fiscal Equity, Inc. v State of New York* (8 NY3d 14 [2006] [*CFE III*]). Indeed, as the Attorney General points out, the Legislature in chapter 57 essentially adopted the Zarb Commission's methodology and conclusions—which we endorsed as reasonable in *CFE III*—to create the formula to determine each district's share of state school aid, and then significantly increased the amount of recommended funding.

In other states where, as in New York, substantial statewide education reforms have been put in place in response to judicial determinations of inadequacy, courts have declined to endorse follow-on adequacy challenges (*see e.g. Hancock v Commissioner*

increased from $25.6 billion ($10.2 billion in state funds) in fiscal year 1995-1996 (the year *CFE I* was decided) to $55.7 billion ($23.4 billion in state funds) in fiscal year 2009-2010 (New York State Education Department, Education Statistics for New York State [Table 10: Total Expenditures and State Funds for Public Elementary and Secondary Schools], available at http://www.p12.nysed.gov/irs/statistics/public/2012/TABLE10.pdf [accessed June 19, 2012]).

2. This is the first adequacy case to survive a motion to dismiss since *CFE I* (*see New York Civ. Liberties Union v State of New York*, 4 NY3d 175, 182 [2005] ["because school districts, not individual schools, are the local units responsible for receiving and using state funding, and the State is responsible for providing sufficient funding to school districts, a claim under the Education Article requires that a district-wide failure be pleaded"]; *New York State Assn. of Small City School Dists., Inc. v State of New York*, 42 AD3d 648 [3d Dept 2007] [dismissing complaint for failure to allege district-wide failure for any particular school district]). These two cases, involving many of the same interests as this one, apparently served as something of a dress rehearsal.

of Educ., 443 Mass 428, 822 NE2d 1134 [2005 plurality]; Londonderry School Dist. SAU #12 v State, 157 NH 734, 958 A2d 930 [2008]; Montoy v State, 282 Kan 9, 138 P3d 755 [2006]; see also Dayton, Dupre and Houck, Brother, Can You Spare a Dime? Contemplating the Future of School Funding Litigation in Tough Economic Times, 258 Educ L Rep 937 [Sept. 30, 2010] [summarizing the trend in recent adequacy cases toward deference to legislators, who are constitutionally required to balance state budgets annually]). Underlying these decisions is a forbearance seemingly born of heightened separation-of-powers sensitivities where the political branches have engaged in good-faith education reforms, given that the constitutional standards in this area are ambiguous, the solutions are subjective and the results are uncertain. Other state courts in recent years have dismissed new adequacy claims outright, expressing reluctance to risk entanglement with the prerogatives of the elected branches (see Bonner v Daniels, 907 NE2d 516, 522 [Ind 2009]; Oklahoma Educ. Assn. v State ex rel. Oklahoma Legislature, 158 P3d 1058, 1066 [Okla 2007]; Nebraska Coalition for Educ. Equity & Adequacy [Coalition] v Heineman, 273 Neb 531, 557, 731 NW2d 164, 183 [2007]).

The Attorney General asks us to dismiss plaintiffs' complaint, but does not suggest that we overrule the CFE line of cases. Rather, he asks us to emulate sister state courts by, in effect, reverting to Levittown's more modest conception of justiciability in light of the passage of chapter 57, which signaled the political branches' serious engagement with issues of education funding, costs and reform. In fact, after this case was argued Governor Cuomo announced formation of a blue-ribbon commission with a wide-ranging charter to examine the State's K-12 education system, specifically including the problems facing high-need urban school districts (see Executive Order [Cuomo] No. 44 [9 NYCRR 8.44] [dated Apr. 13, 2012]).

I would accept the Attorney General's invitation and dismiss the complaint. Plaintiffs seek increased state funding on the theory that more money necessarily equals better student outcomes. They criticize the education aid formula prior to 2007, as it was applied to their small city school districts, but most of their ire is directed at chapter 57. In their view, the 2007 reforms assigned too humble a piece of New York's school aid pie to their districts. Thus, this lawsuit, as is invariably the case in adequacy litigation, implicates a host of public policy questions. First and foremost, what exactly needs to be done to

improve schools and student performance—especially, to close the achievement gap—and what is the price tag for these necessary measures, once settled upon? Given the extensive and continuing debate prompted by the publication of *A Nation at Risk* nearly 30 years ago,[3] the answers to these fundamental questions remain elusive. Additional, equally subjective and policy-laden fiscal questions inhere in this lawsuit. Just for starters, what size budget do the State's revenues support in a particular year? how much of this revenue should the Legislature appropriate to support public education, as opposed to Medicaid or public assistance or other government programs and operations? how much should the public be taxed to support public education? how should the financial burden be shared by localities and the State?

The "stubborn thing[ ]"[4] at the heart of this case is that the way in which these public policy questions are resolved by the Governor and the Legislature will dictate how much school aid plaintiffs' districts receive year to year in the future. We do plaintiffs no favor by keeping alive the illusion they can successfully end-run this fact via the courts.

Accordingly, I respectfully dissent.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur in memorandum; Judge CIPARICK concurs in a separate opinion; Judge SMITH concurs in a separate opinion in which Judge PIGOTT concurs; Judge READ dissents in another opinion.

Order affirmed, etc.

[974 NE2d 661, 950 NYS2d 615]

---

3. National Commission on Excellence in Education, *A Nation at Risk: The Imperative for Educational Reform* (1983).

4. "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passion, they cannot alter the state of facts and evidence" (John Adams, Argument in Defense of the Soldiers in the Boston Massacre Trials [Dec. 1770]).