OPINION OF THE COURT
Kimberly A. O’Connor, J.
This action by representatives of schoolchildren from eight small city school districts in New York State follows the Campaign for Fiscal Equity {CFE) litigation involving the New York City schools, which spanned approximately 12 years, and resulted in a judicial determination that the State of New York was violating the constitutional rights of New York City’s schoolchildren (see Campaign for Fiscal Equity v State of New York, 86 NY2d 307 [1995] [CFE I]; Campaign for Fiscal Equity v State of New York, 100 NY2d 893 [2003] [CFE II]; Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d 14 [2006] [CFE III]). The cornerstone of the determination in the CFE case was that state education funding to New York City schools was so inadequate that it deprived New York City schoolchildren of their constitutionally-mandated opportunity for a sound basic education (see CFE II, 100 NY2d at 908-919). The plaintiffs here have made similar claims.
Development of Foundation Aid Post-CFA
In 2007, in response to the judicial determination in CFE that the State’s funding mechanism for the New York City *297 schools was constitutionally inadequate, the executive and legislative branches of New York State government reformed the method of determining school aid for all school districts in the State of New York. This reform wholly changed the way school funding was calculated, creating a new funding formula called “Foundation Aid.” Foundation Aid is calculated on a per student basis, as follows:
“[S]tart with a foundation amount, which is a single number .... [M]ultiply that by a district specific pupil needs index and then . . . multiply that number by a district specific regional cost index, which yields ... a total adjusted foundation amount from which ... an expected minimum local contribution [is subtracted]. The difference of that subtraction yields ... a State aid per pupil, which is the foundation aid per pupil amount” (tr at 4031).
The foundation amount is derived from the “Successful Schools Model.” Essentially, the New York State Department of Education looks at the data from school districts that meet certain achievement criteria, and then the per pupil spending in those districts is analyzed. Next, a subset of the lower-half of those spending districts is created,[1] and the average per pupil spending within that subset is calculated. That amount is the foundation amount, which is updated every three years.
This fundamental change in the way school aid is calculated in New York State was the subject of years of analysis and negotiation by and between the legislature and the executive. It was enacted in 2007 by the legislature, and was signed into law by the Governor as a part of the state budget. The new law created a plan to implement an increase of $5.5 billion in school aid for the entire State over a period of four years.
Furthermore, the State engaged in non-fiscal reforms following the CFE case that were designed to improve the overall performance of the schools through accountability measures and raising standards, as well as teacher performance evaluation. During this time period, the federal funding known as “Race to the Top” was being implemented, along with increased standards known as “Common Core.” All witnesses at trial noted the negative impact that these significant changes had *298 on student performance, both statewide and nationwide. The increase in standards and substantial changes in standardized testing resulted in significant decreases in student performance across the State, impacting the eight school districts and negatively influencing the students’ performance.
In the 2007-2008 and 2008-2009 state budgets, Foundation Aid was enacted and implemented as originally planned. However, the enacted state budget in 2009-2010 included a freeze in the amount of Foundation Aid at the 2008-2009 level. The 2008-2009 budget also reduced the amount of school aid through a mechanism called a “Deficit Reduction Assessment.”[2] Beginning in 2010-2011, the enacted state budget again included the Foundation Aid freeze, as well as a Gap Elimination Adjustment (GEA), which reduced the school aid amount for each district. Foundation Aid began to be phased in again in the 2012-2013 state budget, and the GEA has been reduced or rolled back piecemeal over several recent budget years.
Plaintiffs’ Case—The Trial
It is against this backdrop that plaintiffs, representatives of children in eight small city school districts[3] in the State of New York, have brought this action against the State for declaratory and injunctive relief, alleging that the schoolchildren in these school districts are being deprived of the opportunity for a sound basic education, required by article XI, § 1 of the New York State Constitution, based upon the reduction in state education funding noted above. The trial of this matter took place over the course of approximately two months, commencing on January 21, 2015 and concluding on March 12, 2015. The court has had a full opportunity to consider the evidence presented with respect to the issues in the case, including testimony from many witnesses, as well as countless exhibits and the voluminous pleadings.
The court has also reviewed the parties’ posttrial submissions, including, among other things, a Joint Statement of *299 Undisputed Facts (Joint Statement), dated October 28, 2015, in which they stipulated to the following categories of information presented at the trial for each of the school districts: enrollments, demographics, staffing counts/ratios, class sizes, per pupil expenditures, graduation rates, dropout and suspension rates, and test scores. The court adopts these stipulated facts and incorporates the Joint Statement in its entirety by reference herein. There were numerous stipulations during the course of the trial that are also recognized by this court, and are incorporated into this decision and order.
The amount of state aid received by each of the eight school districts for each year[4] was not the subject of a stipulation. However, based upon the presentation of this issue in the parties’ posttrial submissions, there is no disagreement regarding the amount of state aid provided, or the amount of the GEA. In fact, it appears as though the only reason these numbers were not the subject of a stipulation was the way the numbers were described and presented, and the disagreement about the plaintiffs’ characterization regarding a “gap” in the state aid. Nevertheless, the actual numbers are undisputed.
The common thread running through the eight school districts is one of high-need, based upon the demographics of most of the children in the districts. It is undisputed that many, and often a majority, of children in these districts are economically disadvantaged, have disabilities, and/or have limited English proficiency. The parties generally agree that children with higher needs often require programs to address the problems that their situations and circumstances create. The performance of the children in these school districts is undeniably inadequate. It is the import of this performance deficiency analyzed through the lens of the adequacy of funding that this court must address, and is the area where the parties’ agreement ends.
CFE Decisions—Setting the Legal Landscape
Analysis of the constitutional adequacy of school aid, as well as the court’s role in making such determination, must necessarily begin with CFE. In CFE I, the Court of Appeals held that the Education Article of the New York State Constitution “requires the State to offer all children the opportunity of a *300 sound basic education” (86 NY2d 307, 316 [1995]). A sound basic education was understood by the Court to mean “the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury” (CFE I, 86 NY2d at 316). Eight years later, in CFE II, the Court of Appeals defined “sound basic education” more exactly as “the opportunity for a meaningful high school education, one which prepares [children] to function productively as civic participants” (100 NY2d 893, 908 [2003]).
In determining whether New York City schoolchildren were being provided the opportunity for a sound basic education required by the State Constitution, the Court of Appeals, in CFE II, reviewed the “inputs” children receive, i.e., teaching, facilities, and instrumentalities of learning, and the resulting “outputs,” such as test results, graduation rates, and dropout rates, and concluded that the plaintiffs had “establish [ed] . . . a causal link between the present funding system and [a] failure to provide a sound basic education to New York City school children” (100 NY2d at 908, 919). The Court agreed with the trial court’s reasoning “that the necessary ‘causal link’ between the present funding system and the poor performance of City schools could be established by a showing that increased funding can provide better teachers, facilities and instrumentalities of learning,” and found “that this showing, together with evidence that such improved inputs yield better student performance, constituted plaintiffs’ prima facie case, which plaintiffs established” (id. at 919).
Ultimately, the Court of Appeals held “that, whether measured by the outputs or the inputs, New York City schoolchildren [were] not receiving the constitutionally-mandated opportunity for a sound basic education” (id.). In rendering this determination, the Court observed that
“[p]laintiffs have prevailed here owing to a unique combination of circumstances: New York City schools have the most student need in the [S]tate and the highest local costs yet receive some of the lowest per-student funding and have some of the worst results. Plaintiffs in other districts who cannot demonstrate a similar combination may find tougher going in the courts” (id. at 932).
To remedy the constitutional violation, the Court directed the State to “ascertain the actual cost of providing a sound basic *301 education in New York City,” adding that “[r]eforms to the current system of financing school funding and managing schools should address the shortcomings of the current system by ensuring, as a part of that process, that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education,” and that the “new scheme should ensure a system of accountability to measure whether the reforms actually provide the opportunity for a sound basic education” (id. at 930). The State was given a July 30, 2004 deadline to implement the necessary measures (see id. at 930-931).
CFE III, decided by the Court of Appeals in 2006, addressed “the cost of providing children in New York City’s public schools with a sound basic education” (8 NY3d 14, 19 [2006]). In doing so, the Court discussed the role of the courts in evaluating challenges to components of the state budget, stating:
“In CFE II, we expressed the necessity for courts to tread carefully when asked to evaluate state financing plans. On the one hand, the Judiciary has a duty ‘to defer to the Legislature in matters of poli-cymaking, particularly in a matter so vital as education financing, which has as well a core element of local control. We have neither the authority, nor the ability, nor the will, to micromanage education financing.’ (100 NY2d at 925.) On the other hand, ‘it is the province of the Judicial branch to define, and safeguard, rights provided by the New York State Constitution, and order redress for violation of them’ (id.)” (8 NY3d at 28).
The Court went on further to state that
“ ‘[w]hile it is within the power of the judiciary to declare the vested rights of a specifically protected class of individuals, in a fashion recognized by statute . . . the manner by which the State addresses complex societal and governmental issues is a subject left to the discretion of the political branches of government’ ” (id., quoting Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, 239-240 [1984]), and that “[w]hen [the judiciary] review [s] the acts of the Legislature and the Executive, [it] do[es] so to protect rights, not to make policy” (id.).
According to the Court, “[d]eference to the Legislature is especially necessary where it is the State’s budget plan that is *302 being questioned” because “[d]evising a state budget is a prerogative of the Legislature and Executive” and “the Judiciary should not usurp this power” {id. at 28-29). The Court recognized that “[t]he legislative and executive branches of government are in a far better position than the Judiciary to determine funding needs throughout the state and priorities for the allocation of the State’s resources” {id. at 29), and noted that the
“deference to the Legislature’s education financing plans is justified not only by prudent and practical hesitation in light of the limited access of the Judiciary to the controlling economic and social facts, but also by [the] abiding respect for the separation of powers upon which our system of government is based” {id. at 28 [internal quotation marks and citation omitted]).
As such, the Court maintained, the judiciary “cannot intrude upon the policy-making and discretionary decisions that are reserved to the legislative and executive branches” {id. [internal quotation marks omitted]).
Mindful that “|j]udicial intervention in the state budget may be invoked only in the narrowest of circumstances,” the Court of Appeals, in CFE III, found, among other things, that the State’s estimated cost to provide New York City’s schoolchildren with a sound basic education, which included additional operating funds in the amount of $1.93 billion in 2004 dollars, “was . . . reasonable . . . and that the courts should defer to this estimate, appropriately updated” (8 NY3d at 19-20, 29 [internal quotation marks omitted]). Notably, the conditions and circumstances in the New York City schools that led to the Court of Appeals’ determination that the funding structure was unconstitutional and that more funding was needed to ensure that New York City children are receiving a sound basic education demonstrate severe need by significantly underperforming schools. As such, the bar was appropriately set very high.
The Parties’ Contentions—Scope of the Case
As in CFE, plaintiffs’ fundamental claim in this case is that the children in the eight small city school districts have been deprived of the opportunity for a sound basic education based upon the inadequate level of funding provided by the State. However, picking up where CFE left off, these plaintiffs contend that the education funding levels created by the enact *303 ment of Foundation Aid over the four-year period established in the 2007-2008 enacted state budget provides a constitutional minimum or floor, and the reductions in the enacted budgets in the years that followed violate the New York State Constitution.
Here, the plaintiffs seem to have isolated the problems in these eight school districts in a much more direct and specific way than the plaintiffs in CFE. At trial, plaintiffs focused on what may be utilized by a school district to address the circumstances of high-needs students, namely those who are economically disadvantaged, have disabilities and/or have significant language barriers. The overall theme of the plaintiffs’ case involves what they believe to be the additional steps required to provide these high-needs students with a sound basic education. In addition, they attempted to demonstrate that the freeze in the Foundation Aid formula and the cuts in funding beginning in 2009-2010 were directly related to the poor performance of these students.
The State disputes the plaintiffs’ contentions, and argues that the legislature and executive were not bound to the amounts of Foundation Aid enacted in the 2007-2008 budget. The State further contends that the New York State Constitution requires all moneys spent to be done so pursuant to an appropriation, and that such payments must be made within two years of the appropriation (NY Const, art VII, § 7). In addition, the State claims that the funding levels created in the 2007-2008 budget were a statement by the political branches of government about the level of funding that could be provided for in the four-year period, but did not establish a minimum amount that could not be reduced. The State contends that it is the duty of the political branches of government, namely, the executive and the legislature, to determine in each budget cycle, how to spend the State’s money and meet its constitutional obligations.
Framing the Issue—CFE v Post-CFE
With CFE as a guide, it is clear that the court must walk a fine line when deciding cases of this nature, careful of the “tension between our responsibility to safeguard rights and the necessary deference of the courts to the policies of the Legislature” (CFE III at 28). While plaintiffs in this lawsuit have framed and presented their case in the context of a CFE analysis, i.e., each witness discussed inputs, outputs, and the *304 causal link between funding and performance, a determination of the issues in this case require this court to look outside of the CFE framework and at the actions undertaken by the State post-CFE. Therefore, an examination similar to the analysis outlined in CFE regarding inputs, outputs, and causal linkage is not required.
Simply put, this case is presented in a totally different posture and context than CFE, given the proof plaintiffs offered at trial. Instead of engaging in a detailed analysis based upon the CFE framework, it is imperative that the court examine the actions of the State in the post-CFE environment. Measuring the State’s response to the determination in the CFE case is paramount to understanding and analyzing what is constitutionally required. These small city school districts do not take issue with the response from the State to CFE, but instead are critical of the actions taken by the State to reduce funding after Foundation Aid was enacted. The fluid nature of the budget process from year to year, and the continued response by the State to address the issues in the budget relating to education funding make analysis of these issues based upon a snapshot in time nearly impossible to assess given the circumstances of this case. The proof at trial showed the freeze in Foundation Aid, the GEA, and the State’s continued response to those changes in education funding. This court is mindful of the cautionary tale outlined at length by the Court of Appeals in the CFE decisions regarding the judiciary’s limited role in a case of this nature.
Here, the State has already taken steps to address the concerns raised in the CFE case, and fundamentally changed the structure and methodology of education funding in the State of New York, and has also increased the funding levels. It is not the judiciary’s role to make a determination of exactly what number is appropriate to fund a particular school district, but instead the court must determine whether the State’s funding mechanism is reasonable and rational, or if the State has failed to meet its constitutional obligation (see CFE III at 14, 26, 29). It is interesting to note that in the plaintiffs’ reply to the defendant’s posttrial memorandum, plaintiffs frame the issue as follows:
“Unlike in CFE, [p]laintiffs are not alleging that the current funding system (Foundation Aid) is itself inadequate to provide the opportunity for a sound basic education. Rather it is the State’s fail *305 ure to fully fund the system that is causing the deprivation of a sound basic education in the Maisto [d]istricts” (tr at 46).
By framing the issue in this more specific way than was before the Court in CFE, it is clear that the plaintiffs agree that the State took steps to remedy the problems identified by the Court in the CFE case. The fundamental question, then, before this court is whether the State can alter or adjust the education reform plan that was put into place by changing the levels of funding for each school district based upon the fluctuation of the State’s fiscal condition, the needs of the school districts, the level of local contribution and federal funding for the school districts, and other competing issues that are considered in the development of the New York State budget, and still deliver on its obligation to ensure that schoolchildren are provided the opportunity for a sound basic education. The answer to that question is yes.
Analysis
Turning to the specific arguments, the court concludes that the plaintiffs have failed to establish their claim that the State has not met its constitutional obligation to provide the students in the eight small city school districts with the opportunity for a sound basic education. First, the court agrees with the State that the New York State Constitution requires that all state moneys be spent pursuant to an appropriation, and that such spending must be made within two years of the appropriation. These constitutional requirements make it impossible for the actions of a legislature to bind future legislatures with regard to its funding decisions. Therefore, the court finds that the enacted budget of 2007-2008 did not, and could not, require future legislatures to fund school aid in the manner enacted that year.
Additionally, the plaintiffs did not demonstrate that the enactment of Foundation Aid established a minimum amount that could not be reduced. It is compelling to this court that the Court of Appeals in CFE III found the methodology set forth in the State Education Reform Plan proposed by Governor Pataki in 2006 (the Pataki proposal),[5] which increased education spending by $2.5 billion over five years, to be reasonable (see 8 NY3d at 30-31). This determination is critical in this *306 case because the Court of Appeals has already determined that the methodology in the Pataki proposal, which had very similar elements to the structure of Foundation Aid, was a reasonable approach to restructuring funding for schools. Specifically, the Court of Appeals stated, “we do not find unreasonable the assertion that $2.5 billion in additional revenues statewide (equating to $1.9 billion in New York City) was a valid determination of the cost of providing a sound basic education in New York City” (id. at 30 [internal quotation marks and citation omitted]). The State contends that this determination by the Court of Appeals, finding that a substantially lower level of funding is constitutionally adequate, necessarily negates plaintiffs’ argument that the level of enacted Foundation Aid, commencing in 2007-2008 and phased in over four years, is the constitutionally-permissible minimum. The court agrees.
Since the Court of Appeals found that the general methodology in the Pataki proposal was a reasonable approach to determining the level of aid for New York State’s school districts, and that methodology resulted in a substantially smaller increase in funding to the school districts than was enacted as Foundation Aid in the 2007-2008 budget, the court finds that the plaintiffs have not met their burden of demonstrating that the State’s actions in reducing Foundation Aid was unconstitutional. That the Court of Appeals specifically found the increase in funding in the Pataki proposal to be “a valid determination of the cost of providing a sound basic education in New York City,” and did not, and could not, rule specifically on the actual increase in spending outside of New York City, does not undercut the Court’s determination that the methodology was reasonable. The Court’s analysis of that approach supports a determination by this court that, overall, the statewide increases that the Pataki proposal set forth were also reasonable, since the method used to determine such figures was reasonable. As such, the plaintiffs’ argument must fail.
Conclusion
The ever-changing landscape of education funding makes developing school budgets a challenge for the State and school districts every year. All of the witnesses during the trial testified about the additional fundamental truth that school districts statewide struggle with the monumental task of determining how to best allocate the resources available to *307 provide the best opportunity for their students to receive a sound basic education. School districts and the State have an unwavering commitment to constantly strive to provide schoolchildren with the basic tools they will need to succeed in the world. This is an uphill battle for many of the children in New York State’s school districts, based upon the external struggles and forces they face on a daily basis, such as economic disadvantages, language barriers, and disabilities, as well as a myriad of other factors and circumstances unique to each child. The plaintiffs presented the testimony of many witnesses highlighting the challenges that educators face in trying to overcome the external obstacles that many students face. However, the remedies that the plaintiffs propose seem to depart from the basic educational purpose and attempt to solve the socioeconomic, cultural, and other aspects of these students’ circumstances that impact their lives in so many ways, including their ability to successfully move through the educational system. Plaintiffs suggest that the State has essentially given up on these children and determined them to be “uneducable.” That is clearly not the case given the education reforms that have taken place since the CFE case was decided, both as funding reforms, as well as substantive reforms designed to assist school districts in improving student performance.
The performance of many of the students is not acceptable, and the educators, administrators, state actors, and other employees of the school districts have a responsibility to see the reforms through to the end and improve the results for their students. However, the action that is required is not in the form of a specific dollar amount, but is instead a blend of funding, oversight, and proper allocation of resources by the districts. These students certainly deserve the opportunity to succeed. However, it cannot be said that the State has violated its constitutional obligations by reducing the amount of Foundation Aid.
The response of the State to the outcry from the school districts across the State regarding the cuts in education funding provides telling information about the adequacy of the State meeting its constitutional obligation. The State has continued to address the issues raised by school districts across the State in the development of the state budget every year, as well as through the implementation of non-fiscal reforms that provide assistance to school districts. Unfortunately, no funding mechanism will ever be perfect, and it is a laudable goal, but an *308 impossible dream, to reach a 100% success rate for students in all measurable areas. In the infancy of the post-CFE world, where Foundation Aid has barely gotten off of the ground, it cannot be said that the State has failed to meet its constitutional obligation. This fact, in conjunction with the other significant reforms to the standards in the State, the teacher performance tools and measures, and other non-fiscal reforms designed to assist these struggling school districts to achieve improved student performance, creates an environment that cannot truly be assessed yet. The judiciary spoke, and the political branches responded; however, the effectiveness of that response cannot yet be measured.
For all of these reasons, it is hereby ordered, that plaintiffs’ third amended complaint is dismissed.

. The lower-half of those spending districts means the half of the school districts meeting that criteria whose spending is in the lower range of the subset.

. It is undisputed that the reductions that resulted from the Deficit Reduction Assessment in 2009-2010 were counteracted by federal funding as a part of the American Recovery and Reinvestment Act.

. When this action was commenced, plaintiffs included the representatives of children in 11 small city school districts in New York State. During the pendency of the action, the claims of the representatives of children in three of those districts have been discontinued, leaving eight school districts remaining: Jamestown, Kingston, Mt. Vernon, Newburgh, Niagara Falls, Port Jervis, Poughkeepsie, and Utica.

. At the outset of the trial, the parties stipulated that the evidence at trial would pertain to the 2006-2007 school year through the 2013-2014 school year.

. The enacted 2007-2008 state budget which included Foundation Aid differed to some extent in the formula and was a more substantial increase.